546 P.2d 54

MICO MOBILE SALES AND LEASING,
INC., Cross Plaintiff-Appellant,

v.

SKYLINE CORPORATION, a corporation,
et al., Cross Defendants-Respondents.

SKYLINE CORPORATION, a corporation,
Third-Party Plaintiff-Appellant,

v.

UNITED STATES BRASS CORPORATION,
Third-Party Defendant-Respondent.

Nos. 11747, 11748.

Supreme Court of Idaho.

Dec. 1, 1975.

Richard C. Fields, of Moffatt, Thomas, Barrett & Blanton, Boise, for appellant Mico Mobile Sales & Leasing, Inc.

Phillip M. Barber, of Elam, Burke, Jeppesen, Evans & Boyd, Boise, for appellant (no. 11748) and respondent (no. 11747) Skyline Corp.

Donald A. Ronayne, of Rayborn, Rayborn & Ronayne, Twin Falls, for respondent Vern Thomas Plumbing & Heating.

Dale Clemons, of Clemons, Cosho, Humphrey & Samuelson, Boise, for respondent Idaho Chemicals, Inc.

Mark S. Geston, of Eberle, Berlin, Kading, Turnbow & Gillespie, Boise, for respondent United States Brass Corp.

John Hepworth, of Hepworth, Nungester & Felton, Buhl, as amicus curiae.

McFADDEN, Justice.

This appeal arises from a products liability action instituted by Mr. and Mrs. Craig Rumpeltes of Ketchum, Idaho, to recover damages for the wrongful death of their thirteen month old son, Travis Rumpeltes. The cause of Travis' death was methanol poisoning; he died after he consumed the contents of a baby bottle prepared by his mother which contained a mixture contaminated with methanol.[1]

Laboratory tests indicated that methanol was in the domestic plumbing system of a new mobile home. This mobile home was purchased by the Rumpeltes from Mico Sales and Leasing, Inc. (hereinafter "Mico") and manufactured by Skyline Corporation (hereinafter "Skyline"). According to the record, Mico had used the methanol in the plumbing system as an antifreeze agent. Mico had purchased the methanol from Idaho Chemicals, Inc. (hereinafter "Idaho Chemical"). The Rumpeltes may have been unable to flush the antifreeze from the plumbing system because of two defects—a cold water line clogged with debris from the construction process, and a kitchen faucet with an improperly installed seal. The kitchen faucet, installed as a component part by Skyline, was manufactured by United States Brass Corporation (hereinafter "U. S. Brass"). The Rumpeltes had contracted with Vern Thomas, doing business as Vern Thomas Plumbing and Heating (hereinafter "Vern Thomas"), to connect the mobile home's gas system to a gas meter and for plumbing work.

The Rumpeltes filed an amended complaint against Mico, Idaho Chemical, Skyline and Vern Thomas for the wrongful death of their child. Mico filed a cross claim against Idaho Chemical, Skyline, and Vern Thomas, seeking indemnification and/or contribution. Skyline, in turn, filed a third party complaint against United States Brass Corporation.

Skyline, Idaho Chemical, and Vern Thomas, each moved for summary judgment as to the Rumpeltes complaint, and also, as to Mico's cross claim. I.R.C.P 56. U. S. Brass also moved for summary judgment against Skyline on its third party complaint. The district court granted each motion on the ground that there was no genuine issue as to any material fact in the claims alleged and each of the parties were entitled to judgment as a matter of law.

The action was tried as to Rumpeltes' complaint against Mico. The jury returned a verdict for the Rumpeltes and judgment was entered in accordance with the verdict. Initially, Mico appealed from that judgment. However, this court dis-

---

1. Methanol, a toxic substance, is methyl alcohol, also known as wood alcohol.

missed that appeal upon stipulation of the parties.

Mico appeals from the district court's order granting summary judgment to Skyline, Idaho Chemical, and Vern Thomas. Skyline appeals from the order granting summary judgment to U. S. Brass on Skyline's third party complaint. These appeals have been consolidated.

The events leading to Travis' death will be summarized. The implications of these events as they pertain to the questions raised on appeal will be discussed in other portions of this opinion.

The Rumpeltes' mobile home, manufactured by Skyline, was delivered to Mico, the retail dealer, with two defects in the domestic water system:[2] the water line delivering cold water to the kitchen sink was plugged with debris from the manufacturing process, and the kitchen faucet did not allow cold water to flow from the faucet because of an improperly installed teflon seal. The faucet, manufactured by U. S. Brass, was activated by a single lever which controlled the water flow and temperature.

After delivery of the mobile home by Skyline, the manufacturer, to Mico, the dealer, Mico's agents pumped an antifreeze substance, methanol, into the domestic water system and then supposedly removed the methanol from the plumbing system. The process was done to protect the plumbing system from the freezing of residual water in the system. A serviceman for Mico testified that a mixture of methanol and water could still remain in the low lying portions of the domestic water system. Mico purchased the methanol from Idaho Chemical; it was delivered to Mico in fifty-five gallon drums which were not labeled with a warning as to the toxic qualities of methanol.

After the Rumpeltes purchased the mobile home, Mico delivered the unit to Ketchum, Idaho. When the unit was delivered, Mico's serviceman informed Craig Rumpeltes that there was antifreeze in the "lines" and instructed him to flush the "water lines". The serviceman did not inform Rumpeltes of the toxic qualities of the antifreeze (methanol). At that time, Mico's serviceman connected the water system to an outside water source but did not turn on the water. The serviceman did not test or examine the domestic water system after delivery of the trailer.

Mrs. Rumpeltes contacted Vern Thomas and requested the company to connect the water system and gas lines. Craig Rumpeltes had informed her of the need to flush out the water system and she testified that Mico's serviceman had also told her, in a joking manner, about the alcohol in the system as he was preparing to leave the second day.

The day after the mobile home was delivered, Gary Gutches, a plumber employed by Vern Thomas, connected the mobile home's gas system to the gas meter and, working with a serviceman from the gas company, turned on the gas. He replaced a broken water faucet (a "hose bib") and then turned on the water to fill the hot water tank so that the gas company's serviceman could light the water heater's pilot light. He checked the bathroom and kitchen faucets to determine that water was flowing from them. He left the mobile home with both the bathroom and kitchen faucets[3] open. Mrs. Rumpeltes left the faucets open for approximately thirty minutes from the time the water was turned on.

The afternoon of the same day, Mrs. Rumpeltes prepared a baby bottle for Travis with a mixture of apple juice and water drawn from the kitchen tap. She

2. Unless otherwise indicated, all references to the mobile home's plumbing system refer to those portions of the plumbing system designed to deliver drinking water and not to the drainage system through which waste water is removed.

3. The kitchen faucet was of a single lever design. The volume of water flowing and the temperature of the water were controlled by manipulating a single lever.

gave the bottle to Travis; shortly thereafter he became ill and subsequently died. The cause of death was determined to be methanol poisoning. After Travis' death, the defects in the cold water line and the kitchen faucet were discovered and repaired.

I

Before examining the specific facts and principles of law as they may pertain to each party, we must first summarize the general precepts and applicable presumptions by which this court will review the trial court's decision to grant a summary judgment.

" 'Summary judgment is properly granted when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." [Citations omitted.] In determining whether any issue of material fact is in dispute, it is well settled that the facts should be liberally construed in favor of the party against whom summary judgment is sought. [Citations omitted.] In light of this rule, this court has held that summary judgment is improper when a conflict in affidavits respecting issues of fact exists, or when the relevant pleadings, depositions and affidavits raise any question of credibility of witnesses. [Citations omitted.] On the other hand, a mere scintilla of evidence will not create a genuine issue of material fact sufficient to preclude summary judgment. [Citations omitted.] On appeal from an order granting summary judgment, this court must construe the evidence presented to the district court liberally in favor of the party opposing the order and accord him "the benefit of all inferences which might be reasonably drawn." [Citations omitted.]' " *Fairchild v. Olsen,* 96 Idaho 338, 339, 528 P.2d 900,

901–902 (1974), quoting *Straley v. Idaho Nuclear Corp.,* 94 Idaho 917, 918–919, 500 P.2d 218, 219 (1972).

II

(*Mico v. Skyline, Skyline v. U. S. Brass*)

Mico, the retail dealer, in its cross claim against Skyline, the manufacturer, seeks indemnification and contribution. Mico submits that the two defects—the plugged cold water line and the defective kitchen faucet—were proximate causes of Travis' death. Skyline disagrees, asserting that Mico's act of placing a toxic substance in the domestic water system was a superseding cause.

■ This court has adopted the rule of strict liability as it appears in the Restatement (Second), Torts, § 402A (1965), and so the theories of negligence, breach of warranty, and strict liability in tort would be available to a plaintiff in the appropriate case. *Shields v. Morton Chemical Co.,* 95 Idaho 674, 518 P.2d 857 (1974). Mico's complaint will be considered as being founded upon negligence, strict liability in tort, and breach of warranty. Regardless of the theory under which recovery is sought, the plaintiff, to recover, must establish that the injury complained of is causally related to the defendant's act or omission.[4] *Henderson v. Cominco American, Inc.,* 95 Idaho 690, 518 P.2d 873 (1974); *Robinson v. Williamsen Idaho Equip. Co.,* 94 Idaho 819, 498 P.2d 1292 (1972); Hursh and Bailey, American Law of Products Liability 2d §§ 1:6, 1:28 (1974).

Skyline argues that the two defects (plugged water line and defective faucet) chargeable to it were not a legal cause of the death because Mico's act of placing a toxic substance in the domestic water system was a superseding cause. This court has adopted the definition of superseding cause of the Restatement (Second) of Torts § 440 (1965).

"A superseding cause is an act of a third person or other force which by its inter-

4. Some authorities hold that the plaintiff must prove that the injury was proximately caused by the product. 63 Am.Jur.2d *Products Liability* § 22 (1972).

vention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about". *Lundy v. Hazen,* 90 Idaho 323, 329, 411 P.2d 768, 771 (1966). *Accord, Smith v. Sharp,* 82 Idaho 420, 354 P.2d 172 (1960). Mico's act of placing a toxic substance in the water system intervened between the prior alleged negligent acts of Skyline and the injury to Travis. Restatement (Second) of Torts § 441(1) (1965). This court must determine whether, as a matter of law, the intervening act of Mico constituted a superseding cause. According to Restatement (Second) of Torts, § 442 (1965), the following guidelines should be considered in determining whether an intervening act was a superseding cause of harm to another.

" * * *

(a) the fact that its intervention brings about harm different in kind from that which would otherwise have resulted from the actor's negligence;

(b) the fact that its operation or the consequences thereof appear after the event to be extraordinary rather than normal in view of the circumstances existing at the time of its operation;

(c) the fact that the intervening force is operating independently of any situation created by the actor's negligence, or, on the other hand, is or is not a normal result of such a situation;

(d) the fact that the operation of the intervening force is due to a third person's act or to his failure to act;

(e) the fact that the intervening force is due to an act of a third person which is wrongful toward the other and as such subjects the third person to liability to him;

(f) the degree of culpability of a wrongful act of a third person which sets the intervening force in motion."

These considerations have been adopted by this court. *Lundy v. Hazen,* supra at 90 Idaho 329, 411 P.2d 771. See, *Smith v. Sharp,* supra.

Analysis of these considerations requires reference to §§ 435 and 447[5] of Restatement (Second) of Torts. See, Restatement (Second) of Torts § 442, Comments (1965). Under these facts, the issue is whether Mico's placement of a toxic substance in the domestic water system was such a highly extraordinary act so as not to be foreseeable by Skyline, thus, becoming a superseding cause of the injury. See, *Robinson v. Williamsen Idaho Equip. Co.,* supra; *Dewey v. Keller,* 86 Idaho 506, 388 P.2d 988 (1964); Prosser, Law of Torts § 44 (4th ed. 1971).

█ Ordinarily, a question of foreseeability is a question of fact. *Dewey v. Keller,* 86 Idaho 506, 388 P.2d 988 (1964). However, when the undisputed facts can lead to only one reasonable conclusion, this

5. "§ 435. Foreseeability of Harm or Manner of Its Occurrence
(1) If the actor's conduct is a substantial factor in bringing about harm to another, the fact that the actor neither foresaw nor should have foreseen the extent of the harm or the manner in which it occurred does not prevent him from being liable.
(2) The actor's conduct may be held not to be a legal cause of harm to another where after the event and looking back from the harm to the actor's negligent conduct, it appears to the court highly extraordinary that it should have brought about the harm." Restatement (Second) Torts.
"§ 447. Negligence of Intervening Acts
The fact that an intervening act of a third person is negligent in itself or is done in a negligent manner does not make it a superseding cause of harm to another which the actor's negligent conduct is a substantial factor in bringing about, if
(a) the actor at the time of his negligent conduct should have realized that a third person might so act, or
(b) a reasonable man knowing the situation existing when the act of the third person was done would not regard it as highly extraordinary that the third person had so acted, or
(c) the intervening act is a normal consequence of a situation created by the actor's conduct and the manner in which it is done is not extraordinarily negligent." Restatement (2d) Torts.

court may rule upon the issue of foreseeability as a matter of law. *Munson v. State, Dept. of Highways*, 96 Idaho 529, 531 P.2d 1174 (1975).

Thomas Rodgers, acting production manager for Skyline at the time the Rumpeltes' mobile home was manufactured, testified in his deposition that the manufacturer tested and the retail dealer should have tested the mobile home's water system. Skyline's tests consisted of an air pressure test while the unit was being manufactured and a water flow test after the unit had been completed. He testified that, under standard operating procedures, the kitchen faucet would have been flow tested and that the existence of the plugged cold water line and the defective faucet should have been disclosed by the flow tests. Any water remaining in the system after the flow test would be removed by air pressure. He thought that all water remaining in the system could be removed by air pressure. He said that Skyline does not use antifreeze in the fresh water system of their mobile homes.

The pertinent portions of the deposition of William Glass, a serviceman for Mico, can be summarized as follows. It was standard operating procedure for Mico's servicemen to flow test the water systems of Mico's mobile homes. The water system would be filled with water and then the faucets and the plumbing would be checked. The water in the system would be expelled with air pressure. If there was a possibility of freezing, the fresh water system would then be filled with methanol and the methanol would be blown out with air pressure. Glass thought some methanol would remain in the low spots of the system after the methanol was blown out. Glass tested the Rumpeltes' mobile home according to this procedure. At the time he tested the Rumpeltes' mobile home, Glass did not know that methanol was toxic. According to Glass, Mico had used methanol in the fresh water systems of mobile homes for at least six years prior to Travis' death. It was quite common for Glass to find building material, insulation and other construction debris in the plumbing systems of mobile homes.

Berne K. Jensen, the general manager of Mico at the time the Rumpeltes purchased the mobile home, testified in his deposition that it was standard operating procedure to put methanol in the fresh water systems and that this had been done at Mico for ten years prior to Travis' death. He said that Mico tests the mobile home's water system with a water flow test. It was his understanding that all the water from the flow test could not be removed from the plumbing system and so it was necessary to add antifreeze to the fresh water system. He knew that methanol, methyl alcohol, and wood alcohol were all the same product, were toxic, and were not suitable for drinking.

Vern Thomas, owner and manager of Vern Thomas Plumbing and Heating and a licensed plumber, testified in his deposition that he did not have personal knowledge of any other instance where antifreeze had been placed in the fresh water system of a mobile home. He said that he would protect a water system from freezing by blowing out the water with air pressure. He thought that water can be removed from a plumbing system quite easily with the use of air pressure.

In his depositions, Gary Gutches, a plumber employed by Vern Thomas, said that in his opinion methanol should not be used in fresh water systems. Gutches, who connected the gas system in the Rumpeltes' mobile home, testified that he would drain a mobile home's plumbing system by using air pressure and that this process would remove all the water from the system. He also said that it was common for new plumbing installations to contain insulation material, sawdust, and other construction debris.

Melvin Evans, a licensed plumber employed by Vern Thomas, testified that a plumbing system should be "winterized" by draining the system, not by the use of antifreeze. He, too, had found construction

debris in the plumbing systems of mobile homes.

David Bush and Cecil Olsen, who are officers of Idaho Chemical, testified that they would recommend the use of methanol in a fresh water system as an antifreeze, providing the methanol could be properly flushed from the system.

Mico's use of methanol in a fresh water plumbing system was in violation of the "Standard for Mobile Homes" formulated by the American National Standards Committee on Mobile Homes and Recreational Vehicles.

"11.4 Materials

\* \* \* \* \* \*

11.4.3 Prohibited Material. \* \* \* Pipe dope, solder flux, oils, solvents, chemicals, or other substances that are toxic, corrosive, or otherwise detrimental to the water system shall not be used."

According to an administrative rule promulgated by the Department of Labor, the plumbing system of a mobile home must be installed in accordance with these standards. Department of Labor, Administrative Rules and Regulations for Mobile Homes and Recreational Vehicle Standards, 1, (1972); I.C. § 39–4003. It is unlawful to sell a mobile home which is not manufactured in compliance with this standard and it is unlawful to alter or convert a plumbing system so that the system is not in compliance with this standard. I.C. §§ 39–4002, 4006.

■ The record before this court suggests an issue of fact as to whether all water in a fresh water system can be expelled by blowing the lines with air pressure. Nevertheless, this issue is not material to the question of foreseeability. Mico's act of placing the methanol in a fresh water system was in violation of state law, mobile home industry standards, and plumbing trade practices; thus, its act was an ex-

traordinary event which was not foreseeable to Skyline. As a matter of law, Mico's act of placing a toxic substance (methanol) in the fresh water system was a superseding cause. The summary judgment entered in favor of Skyline is affirmed.

■ As the summary judgment in favor of Skyline on Mico's cross claim is affirmed, the appeal of Skyline from the summary judgment in favor of U. S. Brass (case no. 11748) is rendered moot.

III

*(Mico v. Idaho Chemical)*

Idaho Chemical, Inc., sold to Mico methanol which Mico used as an antifreeze in the Rumpeltes' mobile home. Mico argues that Idaho Chemical had a duty to warn Mico of the toxic qualities of the methanol, that Idaho Chemical failed to warn, and that therefore, Idaho Chemical is liable.[6]

■ A failure to warn may be the basis for recovery under strict liability. *Rindlisbaker v. Wilson,* 95 Idaho 752, 519 P.2d 421 (1974). That is, "where the defendant has 'reason to anticipate that danger may result from a particular use' of his product and he fails to give adequate warnings of such a danger, 'a product sold without such warning is in a defective condition'". *Rindlisbaker v. Wilson,* 95 Idaho 759, 519 P.2d 428 (1974), quoting Restatement (Second) Torts § 402A, Comment H (1965). This rule is, however, limited to situations where the danger is not obvious. *Garner v. Crater Farms, Inc.,* 96 Idaho 383, 529 P.2d 779 (1974). However, if the danger is obvious, or if the danger is known to the person injured, the duty to warn does not attach. *Jacobson v. Colorado Fuel and Iron Corp.,* 409 F.2d 1263 (9th Cir., 1969); *Garrett v. Nissen Corp.,* 84 N.M. 16, 498 P.2d 1359 (1972). See, 53 A.L.R.3d 239, Annot., *Products Liability— Failure to Warn* (1973). The question before us is whether there is an issue of fact

---

6. Mico, in its complaint, alleged that Idaho Chemical breached implied and express warranties that methanol was non-toxic and suitable for use as an antifreeze in a domestic water system. On appeal, Mico does not argue that the summary judgment was granted in error insofar as the breach of warranties were concerned; thus, we consider Mico's cause of action against Idaho Chemical to be founded on a strict liability theory. See, *Baker v. Ore-Ida Foods, Inc.,* 95 Idaho 575, 513 P.2d 627 (1973).

as to Mico's knowledge of methanol's toxic qualities.

■ Berne K. Jensen, general manager of Mico, testified in his deposition that he knew that "methyl alcohol and methyl and wood alcohol" were the same product. He said that at the time the methanol was used in the Rumpeltes mobile home that he knew methanol was not suitable for drinking and poisonous to a degree. Thus, Mico is charged with the same knowledge and the duty of Idaho Chemical to warn Mico did not attach. The order granting summary judgment to Idaho Chemical is affirmed.

## IV

### (Mico v. Vern Thomas)

Mico argues that Vern Thomas undertook to inspect the water system and in so doing negligently failed to discover the defects in the plumbing system and that the failure to inspect was a proximate cause of Travis' death. Vern Thomas submits that it was hired only to connect the gas system and so owed no duty insofar as an inspection of the plumbing system was concerned.

This court has adopted "the standard that one who as an independent contractor negligently makes, rebuilds, or repairs a chattel for another is subject to the same liability as that imposed upon negligent manufacturers of chattels". *S. H. Kress and Co. v. Godman*, 95 Idaho 614, 617, 515 P.2d 561, 564 (1973). We have refused to apply the rule of strict liability in tort (Restatement (Second) Torts § 402A) to cases such as this involving personal services. *Hoffman v. Simplot Aviation, Inc.*, 97 Idaho 32, 539 P.2d 584 (1975). Mico did not allege in its complaint nor does Mico argue on appeal that Vern Thomas breached an implied warranty to perform the services in a workmanlike manner. See, *Hoffman v. Simplot Aviation, Inc.*, supra. Thus, Mico's cause of action sounds solely in negligence.

Gary Gutches, a plumber employed by Vern Thomas, who connected the gas system testified that he went to the Rumpeltes' mobile home "to gas pipe the trail-

er". Vern Thomas' invoice for the Rumpeltes' job described the work to be done as "gas pipe customer's new trailer". "Gas piping" involves connecting the mobile home's gas system to the gas meter and then, with the assistance of the gas company's serviceman, checking the gas system with air pressure for leaks.

Ann Rumpeltes requested both Vern Thomas and the gas company to come to the mobile home. Regarding her request to Vern Thomas, she testified in her deposition:

"Q. When you called the plumber, what did you tell the plumber?

A. * * * I just called whoever was there and asked them if they could come out and pressure check for the gas company and to hook up our water."

When Gutches was turning on the water to the mobile home, he noticed that the "hose bib" was broken. (A "hose bib" is a faucet, similar to a garden hose faucet, which connects the mobile home's water system to the outside water source.) As he replaced the bib, he noticed that about two tablespoons of a green liquid flowed from the hose. He testified that he realized at that time that the green material was antifreeze. Gutches turned on the water to fill the water heater and the remainder of the water system. He turned on both the kitchen and bathroom faucets and saw water flowing from both. According to the record, because of the single lever design of the kitchen faucet, the only way Gutches could have determined if both hot and cold water were flowing was to wait until the water had been heated. This procedure would have required a wait by Gutches of approximately forty-five minutes. He testified that one reason he left the water running was because of the antifreeze he noticed.

■ Thus the record discloses a conflict in the evidence as to what Vern Thomas was employed to do. What each party expected as a result of the service will in part define the duty owed by Vern Thomas. The record is also unclear and in conflict as to what services Gutches undertook

to perform after he arrived at the mobile home, as well as to the standard of his performance. See, *S. H. Kress and Co. v. Godman,* supra. Thus, there are genuine issues as to material facts. I.R.C.P. 56(c). The summary judgment granted Vern Thomas is reversed and remanded for proceedings not inconsistent with this opinion.

## V

### (Summary)

The summary judgments on Mico's cross claim as to Skyline Corporation, and Idaho Chemicals, Inc., are affirmed, and, as to Vern Thomas, dba Vern Thomas Plumbing and Heating, is reversed. Costs to Skyline Corporation and Idaho Chemicals, Inc., as to the summary judgments affirmed; costs to Mico Mobile Sales and Leasing as to the summary judgment reversed (appeal no. 11747).

The summary judgment in favor of United States Brass Corporation on the third party complaint of Skyline Corporation is affirmed. Costs on appeal to U. S. Brass (appeal no. 11748).

McQUADE, C. J., and DONALDSON, SHEPARD and BAKES, JJ., concur.