**GLOBAL TRUCK & EQUIPMENT CO., INC., Plaintiff,**

v.

**PALMER MACHINE WORKS, INC., Defendant.**

No. EC 83 174 GD D.

United States District Court, N.D. Mississippi, E.D.

Feb. 7, 1986.

J. Anthony Friloux, Jr., A.T. McKinney, Houston, Tex., William M. Beasley, Tupelo, Miss., for plaintiff.

Hunter M. Gholson, Aubrey E. Nichols, Columbus, Miss., J.O. Prude, Amory, Miss., for defendant.

## MEMORANDUM OPINION

DAVIDSON, District Judge.

The plaintiff Global Truck & Equipment Co., Inc. (Global) brings this action for damages arising from the sale of alleged defective dump trailers sold by Palmer Machine Works, Inc. (Palmer). The plaintiff seeks recovery under the theories of strict liability in tort, negligent design and breach of express and implied warranties. The defendant asserts that the trailers sold by it were free from defect and the trailer turnovers were the result of the misuse of the product in that the trailers were made for hauling washed rock and gravel only and that a cohesive material containing rock and dirt or clay was hauled instead. Plaintiff Global is a Texas corporation primarily engaged in the business of selling and purchasing trucks, trailers and related equipment. Defendant Palmer is a Mississippi corporation engaged in the manufacture and selling of trailers to be used for the hauling and dumping of various materials. This court has jurisdiction of this matter pursuant to its diversity jurisdiction. 28 U.S.C. section 1332. The court proceeds with its findings of fact and conclusions of law pursuant to rule 52 of the Federal Rules of Civil Procedure.

## FINDINGS OF FACT

In late 1980, John Randall, Vice-President and a major stockholder of Global, was contacted by Roberto Lopez of McAllen Motors, at the request of Constructora-Dava, a Mexican contractor, to purchase twenty-five trucks. Lopez stated that the trucks were to be equipped with triaxle frame-type trailers, 30 feet in length, containing a 38 cubic yard capacity,[1] twelve 22 inch tires and having five foot sides. At the time of the sale, Randall of Global and Lopez had been in the business of buying and selling trucks and trailers since 1975 and 1979, respectively. Randall had previously received orders from Lopez for trucks and trailers and, in a desire to continue to please his customers, Randall contacted a number of manufacturers and dealers with which he was familiar but was unable to find a manufacturer who would deliver a triaxle 30 foot trailer by the date that Lopez related that Constructora-Dava needed the trailers. One of the dealers, however, recommended Palmer Machine Works, Inc. and subsequently, Randall telephoned Jason Gallop of Palmer. Randall advised Gallop of the general specifications[2] demanded by the Mexican customer, Constructora-Dava, advised Gallop that the trailers were to be used in Mexico and that they were to be used for hauling washed rock and gravel. An initial order of five trailers instead of the requested twenty-five trailers was made in an attempt to manufacture and deliver the trailers before the expiration of the Mexicans' import permit. The total purchase price of the five trailers was $81,375.00 or $16,275.00 each. Randall placed the order on November 14, 1980 and a deposit of 15 percent or $12,206.25 was paid on November 18. Global paid the balance of the purchase price upon

---

1. The plaintiff contends that the trailers were to carry a maximum 36 cubic yard capacity and that this is what the plaintiff ordered. In Randall's deposition, however, he stated that "... I told him I needed a frame type trailer and [it] needed to be 30 foot long, 36 or 38 yard capacity." According to Jason Gallop of Palmer, he informed Randall that the 30 foot Palmer trailers, with the requested side lengths, would have a 38 cubic yard capacity to which, Gallop testified, Randall consented. The court accordingly finds that Global cannot dispute the 38 cubic yard capacity as excessive since, according to its agent's own deposition, such capacity was acceptable to him.

2. During the telephone conversation, Gallop stated to Randall that the 30 foot trailers were too big and heavy under the laws of Mississippi and most other states since they would exceed legal weight restrictions on public roads when loaded. Randall then informed Gallop that the trailers were to be used in Mexico where the load weight of 30 foot trailers is permissible.

receipt of the trailers at Palmer's facility in Monroe County, Mississippi on November 24, 1980.

After arriving at the site in Mexico, the first trailer was loaded but overturned during the dumping process. The second trailer likewise overturned on its first use. Upon notification of these occurrences, Lawrence R. Palmer, president of the defendant, met with Lopez in McAllen, Texas and from there they traveled to the site in Mexico to supervise and observe the dumping of a third Palmer trailer. Palmer instructed the Mexicans to utilize the same loading and dumping procedures as were implemented with regard to the first two Palmer trailers. The Mexicans proceeded to wet the material with water from hoses at the site and loaded the trailers utilizing loaders. The Palmer trailers in a normal dumping procedure dump at five different levels or stages. At the end of stages 1 and 2, Palmer ordered the dumping process temporarily haulted while he took measurements of the spring deflection underneath the trailer as well as other measurements. Palmer testified that at the first and second stages, about one-third of the load discharged per stage. After taking these measurements, Palmer ordered the trailer raised to the third stage and again stopped. Palmer testified that, at this stage, approximately another ten to fifteen feet of material had discharged, or about 80% of the total load, leaving five to six feet of material in the trailer bed. Lopez and Palmer agree that while Palmer was underneath the trailer, more of the material in the trailer suddenly discharged, causing the trailer to tip to the left, then to the right whereupon the trailer proceeded to fall to the ground.

Palmer later expressed his opinion that the tipovers were caused by the Mexicans not hauling "washed rock," the trailer's stated use, but instead hauling a cohesive mixture of rock and dirt or clay. Palmer, as well as other witnesses, testified that rock and dirt mixtures become cohesive when damp or wet and frequently "hang up" in the front of the trailers during the dumping process and that, for this reason, warnings were placed on the trailers stating that "wet loads may hang up in the front of the trailers and cause an upset." Palmer further testified that, in his opinion, the material loaded on the truck in Mexico weighed at least 3,000 pounds per cubic yard and was 80 percent dirt or clay.[3] Alvin Rakestraw, who is engaged in the trucking, hauling, sand, gravel and mining business and who hauls clay gravel, gravel and washed rock, testified that when cohesive material sticks in the front of a trailer, the material often releases itself in sections instead of uniformly, causing an imbalance and resulting in the trailer overturning. The defendant's two expert witnesses, Dr. Forbes, a professor of mechanical engineering at Mississippi State University, and Ken Tyler, chief engineer for Fontaine, another dump trailer manufacturer, also testified about the dangers of dumping cohesive material from long trailers. Billy Phillips, who stated that he has been hauling sand and gravel for about twenty-five years, testified likewise. Even the plaintiff's expert witness, Dr. Clarence Bell, testified in his deposition, offered for impeachment purposes, that if a load of material hangs in the front of a trailer to one side, tipover may occur. Only the plaintiff's chief expert witness, G.A. Hagelthorn, a professional engineering consultant and a former design engineer for the Freuhauf Corporation, testified to the contrary. However, Hagelthorn testified that the "angle of repose," or the height that a trailer must rise to dump a load of material, increases when clay or compacted earth is dumped as compared to crushed stone or plain gravel. Considering the weight of the evidence, the court finds that the material to be loaded and dumped determines the type of trailer to be selected and that long trailers, though appropriate for hauling rock or washed rock and other noncohesive materi-

**3.** "Washed rock" according to the industry manuals has a weight of 2,700 pounds per cubic yard.

als, should not be used to haul rock and wet dirt or clay mixtures. The court also finds, for reasons more fully expressed later in this opinion, that the dumping of cohesive materials in trailers of the length in issue is not only a misuse of the product but an unforeseeable misuse given the common knowledge in the business of the danger of dumping such cohesive materials in long trailers.

Given these findings, the court proceeds to discuss the evidence concerning the type of material hauled in the Palmer trailers. No eyewitness who observed the loading and dumping of the first two Palmer trailers testified at trial. The only evidence before the court as to the type of material loaded into the first two overturned Palmer trailers is (1) the testimony of Palmer and Lopez that Palmer ordered that the third trailer be loaded with the material the Mexicans had loaded in the other two trailers, and (2) several photos of the overturned trailers. Plaintiff's exhibit 1–F shows one of the Palmer trailers lying on its side with a reddish tint material in its bed along with two piles of material to the rear of the trailer. On direct, Lopez testified that the pile of material shown on the right of the photo, having a rock and dirt appearance, most resembles the material loaded into the third trailer that overturned. On cross, Lopez was shown defendant's exhibits 2, 17 and 18. Exhibit 17 was a jar containing rock only whereas Exhibit 18 was a jar essentially containing dirt. After being shown defendant's exhibit 2—an enlarged photo of one of the overturned Palmer trailers containing material Lopez described as being "washed gravel"—Lopez was asked which jar appeared to contain the material depicted in the defendant's exhibit 2. Lopez pointed to the jar containing the dirt mixture, or defendant's exhibit 18. Randall, in his deposition, admitted into evidence at trial, agreed that "washed rock" is "just pure rocks and gravel." After close examination of defendant's exhibit 2, the court finds that the material contained within the overturned trailer is not "washed rock," but is instead a mixture of clay or dirt with a low ratio of rock. This finding is reinforced by Lopez's identification of the material in the trailer shown in defendant's exhibit 2 as most resembling the dirt mixture contained in defendant's exhibit 18. Further, after examining plaintiff's exhibit 1–F and the depiction of the material to the right of the photo that Lopez identified as being similar to the material loaded in the third trailer, the court finds that this material, though apparently containing a higher rock to dirt ratio than the pile of material depicted in the left-hand side of the photo, is still not "washed rock," or just rock and gravel, as described by Randall in his deposition, but is rather a rock and dirt or clay mixture.

As a result of the overturns of the first three Palmer trailers, Constructora-Dava expressed their dissatisfaction to Randall who refunded Constructora-Dava's money and had the two unused trailers and the three overturned trailers, as well as the five trucks, returned to Global's place of business in Houston, Texas. Global thereafter notified Palmer that it sought revocation of acceptance of the trailers due to their alleged defective nature. Global offered to furnish its Mexican customer with 28 foot, dual axle Lufkin trailers, but the customer refused to accept the smaller, dual axle trailers. Instead, Constructora-Dava purchased short bob-tail trucks, or trucks constructed with an 8–10 foot dump body attached to the frame of the truck.

The plaintiff sought to establish its case as to Palmer's liability primarily through its chief expert witness, Hagelthorn. Hagelthorn testified that one of the major defects of the Palmer trailers sold to Global, and ultimately to Constructora-Dava, was the narrower frame width of the Palmer trailers as compared to the Freuhauf and Trailmobile trailers with which he was familiar. As a result, Hagelthorn stated, the zone of stability of the Palmer trailers was only a total of eighteen inches, or nine inches on each side of the center line. Hagelthorn explained that as a thirty foot Palmer elevates, given its zone of stability, the center of gravity can move only nine inches one way from the center to one side

and that, at this nine inch point, the trailer becomes unstable and will tip over. Hagelthorn suggested a widening of the main beams of the Palmer trailers, noting that remedying this alleged defect could be accomplished without great expense.

However, Hagelthorn also stated that the zone of stability or equilibrium on the Freuhauf and Trailmobile trailers is slightly in excess of twenty inches, only a two inch difference. On cross examination, Hagelthorn, when questioned, did not object to the defendant's assertion that a thirty-two foot Fontaine trailer has a beam spacing of only thirty-seven inches whereas, as testified to by the defendant's expert, Dr. Forbes, the Palmer thirty foot trailer has a beam spacing of thirty-eight inches, or thirty-seven and three-quarters inches excluding the width of the hinges.

Hagelthorn also testified that in his opinion, the crossmembers on the thirty foot Palmer unit are less able to resist warping or torsional forces than would be expected and that this defect, in combination with the narrow frame and the location of the hinges of the trailer at the rear of the suspension center line of the frame, all contributed to or proximately caused the tipovers of the Palmer trailers. The hinge location, Hagelthorn stated, imposed a greater than expected force on the beams causing them to bend in what he described as an angular or distinct point of bending of the beams when the trailer fell rather than a gradual, consistent warping from the front to the rear of the beams as is typically seen in trailer tipovers.

Hagelthorn's conclusions regarding the Palmer trailers directly conflicted with the conclusions of the defendant's experts, Dr. Forbes and Ken Tyler. According to Tyler and Forbes, as well as Hagelthorn, a critical parameter in determining the overall ability of a beam to resist bending is that geometric property known as the section modulus. Hagelthorn, on cross, agreed

that the greater the section modulus, the greater the resistence to deflection. The results of a comparative analysis of the section moduli of similar dump trailers designed and sold by seven different trailer manufacturers performed by Dr. Forbes showed that the section modulus was higher on the thirty foot triaxle Palmer unit than for any other trailer examined. (See Appendix I). Further, the number and thickness of the crossmembers in the Palmer trailer exceeded the number and thickness found on the crossmembers of many of the other trailers of similar length manufactured by Palmer's competitors. In comparison to this rather extensive comparative analysis performed by Dr. Forbes, Hagelthorn conceded that he based his analysis on his knowledge of Freuhauf and Trailmobile trailers and on the examination of one wrecked and one unwrecked trailer chassis of a total of four wrecked trailers at Global's place of business in Houston where the five Palmer trailers are stored. Given these facts, the court finds, as a matter of fact, that no defects existed with respect to the Palmer trailers, particularly with reference to the frame width, the crossmembers or the hinge location.[4]

Hagelthorn also testified that, due to the Palmer trailer design, the maximum payload of the 30 foot trailers was around 85,000 to 90,000 pounds. Palmer estimated that, fully loaded, the material loaded in the trailer bed in Mexico weighed about 114,000 pounds. However, given the testimony of the plaintiff's witness, Lopez, that at the time of the tipover of the third trailer, most of the material had discharged and the testimony of Palmer that nearly 80 percent of the load had discharged, the court finds that the Palmer trailers were capable of carrying and dumping the weight of the loads to which they were subjected.

The plaintiff also asked a number of questions as to whether the defendant employed, or had in its employ, an engineer to

---

**4.** A Michigan trial judge came to a similar conclusion in *Martin Bros. Mill & Foundry Supply Co. v. Fruehauf Corporation,* 11 Mich.App. 573, 161 N.W.2d 767, 768 (1968). In a per curiam opinion the Michigan Court of Appeals affirmed a trial judge's finding that a Freuhauf trailer tipover was the result of a load imbalance rather than defective design.

assist in the preparation of a separate design for the 30 foot triaxle trailers. The defendant's witnesses testified that Palmer used its standard design for its other trailers as well as a Hutchins, heavy-duty suspension system used on some of its other trailers. The trailer design had been utilized by Palmer for many years and had been used in the manufacture of the 30 foot frame type trailer since 1970. The design had been prepared by engineers several years earlier at the instance of Mr. Lawrence Palmer's father Mr. Lawrence Palmer, Sr., a former president of the company, who died in 1981. In the court's opinion the failure to prepare a specific design for the trailers that were ordered by the plaintiff does not lead the court to believe that a design defect probably existed, especially when the court has considered all other design theories advanced by the plaintiff and found them to be inconclusive.

## CONCLUSIONS OF LAW

■ Initially, the court considers the issue as to whether a valid, enforceable contract existed as to twenty-five trailers or only as to five. The sale of the Palmer trailers to Global is considered a sale of goods to which the Uniform Commercial Code (UCC) applies. UCC section 2–102. Mississippi adopted the UCC effective March 31, 1968 and its provisions are codified in Title 75 of the Mississippi Code Annotated (1972). Under the provisions of the UCC, contracts for the sale of goods equaling or exceeding five hundred dollars in value are not enforceable unless a writing exists signed by the party against whom enforcement is sought. Miss.Code Ann. section 75–2–201 (1972). The Palmer trailers were ordered over the telephone by John Randall in a conversation with Jason

Gallop of Palmer Machine Works. Lopez testified that representatives of Constructora-Dava requested that he locate and purchase twenty-five 30 foot trailers. However, funding was only available for five units and the Mexican import permit in late 1980 only provided for the shipment of five units. Gallop testified that Randall only made an initial order of five trailers with the possible order of an additional twenty trailers at a later time. In Randall's deposition, admitted into evidence at trial, Randall stated he only "intended" to order the additional trailers from Palmer at a later time. Since the sale of only one trailer is for an amount in excess of five hundred dollars, the court concludes that UCC section 2–201 applies necessitating a writing signed by an agent of Palmer before the alleged order for the additional twenty trailers is enforceable. Finding an absence of such a writing,[5] the court proceeds to determine whether the alleged order for the additional twenty trailers falls within one of the three exceptions to the statute of frauds set forth in UCC section 2–201(3).

Briefly stated, the three exceptions to the writing requirement are: (1) when the goods are specially manufactured for the buyer and are not suitable for sale to others in the seller's ordinary course of business; (2) when the party against whom enforcement is sought, or in this case, Palmer, admits in its pleading or testimony that a contract was made with regard to the alleged sale; or, (3) when payment for the goods involved in the alleged contract has been made and accepted. The court finds that no admission of the existence of a contract for the additional twenty trailers was made and that Global never tendered and Palmer never received payment for these trailers nor was any deposit ten-

---

5. The only writing consists of notations Gallop made when he took Randall's order over the telephone. (See plaintiff's exhibit 32). This memorandum is not signed by Palmer or any agent of the corporation. Even if Gallop or Palmer had signed the memorandum such that it might be considered a signed writing, it is clear that the figure of $16,275.00, representing an amount for a "15 percent deposit and cash on delivery," is insufficient as a deposit for twenty-five trailers. Rather, the deposit check sent for $12,206.25 (plaintiff exhibit P–A) is only 15 percent of the cost of five trailers. Since the deposit check only covered the cost of five trailers, it is made even more clear that the contract or order was for five trailers only.

dered.[6] Further, the first exception for specially manufactured goods according to its terms, only applies when the seller, not the buyer, of the goods seeks to obviate the statute of frauds defense. The court therefore concludes that, as a matter of law, enforcement of any order in excess of five units is precluded by the statute of frauds.

## STRICT LIABILITY

■ Under Section 402A of the Restatement of Torts (Second), adopted by the Mississippi Supreme Court in *State Stove Mfg. Co. v. Hodges*, 189 So.2d 113 (Miss. 1966), it is fundamental that a product must be found to be sold in a defective condition unreasonably dangerous to the purchaser or ultimate user before liability can be imposed. *Fruehauf Corp. v. Trustees of First, Etc.*, 387 So.2d 106, 109 (Miss. 1980) (elements to be proved in a strict liability case are: (1) that product left manufacturer in defective condition; (2) product in same condition at time of accident as when it left factory; and (3) defect was proximate cause of injury). By failing to establish the existence of a defective condition, the court concludes that Global cannot recover under this theory according to the express terms of Section 402A.

■ The plaintiff also alleges that Palmer is strictly liable in tort for failing to adequately warn of the danger of turnover. In construing section 402A, courts have held that a product free of manufacturing and design defects may still be unreasonably dangerous if adequate instructions are absent or a failure to warn exists. *E.g., Anderson v. Heron Engineering Co., Inc.*, 198 Colo. 391, 604 P.2d 674, 676 (1979); *Wolfe v. Ford Motor Co.*, 6 Mass.App. 346, 376 N.E.2d 143, 145 (1978); *Rindlisbaker v. Wilson*, 95 Idaho 752, 519 P.2d 421 (1974). However, this duty to warn or instruct does not exist when the danger is commonly known or is obvious. *See Wan-*

*sor v. George Hantscho Co., Inc.*, 595 F.2d 218, 221 (5th Cir.1979) (according to Georgia law, no warning required in particular trade or profession against generally known changes in profession); *Mico Sales & Leasing, Inc. v. Skyline Corp.*, 97 Idaho 408, 546 P.2d 54, 61 (1975) (where dealer's general manager knew substance poisonous, dealer charged with manager's knowledge and seller of substance had no duty to warn dealer of danger); *Eyster v. Borg-Warner Corp.*, 131 Ga.App. 702, 206 S.E.2d 668, 670 (1974) (since specific danger of aluminum-copper connection commonly known by those in profession, no duty on manufacturer to warn). The court earlier found as a matter of fact that, according to the weight of the testimony, it is commonly known in the hauling and dumping business that a danger exists in dumping cohesive materials in long dump trailers. The court is of the opinion that although the yellow warning stickers placed on the trailers by Palmer stating that "Wet loads may hang up in the front of the trailers and cause an upset" might be found to be an inadequate warning to someone not in the hauling and dumping business, the warning to an admitted dealer[7] in the truck and trailer business and its customer—a buyer and frequent user of trailers both prior to and after the turnover of the Palmer trailers and who, according to the plaintiff's witness Lopez, was an expert in the hauling industry—more than suffices. The fact that the wording of Palmer's caution sticker was stated only in English and not in Spanish, even though Palmer knew the trailers were to be used in Mexico, does not lead the court to find otherwise since the Mexicans likewise should have known of the danger. The plaintiff offered no witnesses to testify as to the standards of usage or the trade knowledge in Mexico and the court accordingly concludes that it cannot assume that the Mexicans interpret "washed rock" differently or are ignorant of the danger of hauling cohesive material

6. *See supra* note 5.

7. When Randall was asked whether he identified himself as dealing in trucks and trailers,

Randall replied, "Oh, I am sorry, I am sure I did." (Randall's deposition, p. 32).

in long trailers without testimony to that effect.

■ The plaintiff cites *Ford Motor Co. v. Matthews,* 291 So.2d 169, 174 (Miss.1974) in support of the proposition that the alleged misuse of the Palmer trailers in hauling material other than washed rock or gravel was reasonably foreseeable and that such a foreseeable use renders Palmer strictly liable. However, in the *Matthews* decision, the buyer was apparently not a "merchant" under the provisions of the UCC since the opinion fails to state that Matthews customarily dealt in the buying and/or selling of tractors. *See* Miss.Code Ann. section 75–2–104(1) (1972). Here, Randall's deposition reflects that Global sells tractor and trailer units all over the United States, that he sells about a thousand trucks in a "good business year," and exports to other countries, particularly to Singapore, Malaysia, Mexico and Central America. (Randall deposition, p. 13).[8] The proof also establishes that Lopez and the ultimate Mexican customers were likewise experienced in buying and selling dump trailers and their utilization respectively. Therefore, the court concludes that Randall, acting for Global, and Constructora-Dava, were "merchants" according to the terms of the UCC. As such, the plaintiff buyer in this case stands in a somewhat different position than the buyer in *Matthews* due to Randall's supposed superior knowledge. Given the common knowledge in the business of the danger of cohesive material adhering to the front of dump trailers and unevenly discharging during the dumping process and that bob-tail trucks should be used to haul cohesive materials, the court earlier found that not only was the loading and dumping of cohesive

material an improper use of the thirty foot Palmer trailers but that it was also an unforeseeable misuse. This reasoning is particularly applicable in view of the stipulation and the testimony of both Randall and Lopez that the trailers were to be used by the Mexican customers to haul washed rock. The plaintiff repeatedly admitted that the defendant Palmer was told that the trailers would be used to haul washed rock. The court is further influenced by the argument that if all types of material could be properly hauled and dumped in any size trailer, then buyers would have no cause to purchase shorter trailers or bob-tail trucks since the objective of those in the hauling business is to dispose of as much material as is possible in the shortest amount of time.

## NEGLIGENT DESIGN

In 1971, the Fifth Circuit, applying Mississippi law, stated that in negligent design cases, the court must measure the reasonableness of a product's design against objective standards. *Ward v. Hobart Mfg. Co.,* 450 F.2d 1176, 1182 (5th Cir.1971).[9] The Fifth Circuit stated that the criteria most frequently applied in negligent design cases is: (1) the conformity of the product's design to the practices of other manufacturers in the industry on the date of the manufacture of the product; (2) the open and obvious nature of the alleged danger; and (3) the extent of the buyer's use of the product alleged to be defective and the period of time involved in the use by the buyer and/or others prior to the injury without any harmful effects. *Id.* at 1182.

■ Considering these criteria, and the court's finding that the plaintiff failed to

---

**8.** *See supra* note 7.

**9.** According to Shepard's Citations (6th ed. 1982) the *Ward* decision was partially overruled in *Porter v. American Optical Corp.,* 641 F.2d 1128, 1141 (5th Cir.1981). However, a reading of the relevant portions of the opinion leaves the court to conclude that *Ward* was only distinguished. As the court stated:

We do not feel strictly bound by the reasoning set out in *Ward* since in that case the court

was applying Mississippi law and found little state law in the area of negligent design of products. The differing facts and evidence also necessitate distinguishment. We are obligated to view a jury's perception of reasonable design under Louisiana law. Most of the pertinent Louisiana cases speaking to products liability have been decided since the *Ward* decision.

641 F.2d at 1141 n. 17.

prove the existence of a defect, the court concludes that the plaintiff is not entitled to recovery under the theory of negligent design. It is undisputed that all three of the Palmer trailers that overturned did so on the first occasion of their use. However, the extent of the buyer's use of the product prior to the harmful incident is but one factor for the court to consider. The court has stated its opinion that the loading of the 30 foot triaxle Palmer trailers with cohesive material was a misuse of the product according to the common knowledge held by those in the hauling business and was not the intended use as described by Randall in his telephone conversation with Jason Gallop when Randall ordered the five trailers. Given the court's finding that Constructora-Dava's use of the trailers was a misuse that was not reasonably foreseeable by the manufacturerer, particularly in light of Randall's statements as to the use of the Palmer trailers, and the testimony of Dr. Forbes that the Palmer 30 foot trailers essentially conform to the design features and characteristics of other trailers manufacturered by competitors of Palmer Machine Works, the court cannot hold otherwise.

## IMPLIED WARRANTY OF MERCHANTABILITY

Mississippi Code Annotated section 75–2–314 (1972) provides that "a warranty that the goods shall be merchantable is implied in a contract for their sale if a seller is a merchant with respect to goods of that kind." As stated previously, the court concludes that Palmer is a "merchant" according to section 75–2–104(1) since the testimony reflects that it deals in the selling of dump trailers on a regular basis. Section 75–2–314 further states that, in order for goods to be considered merchantable, they must at least pass without objection in the trade and be fit for the ordinary purposes for which the goods are to be used. Miss.Code Ann. section 75–2–314(2)(a), (c) (1972). Again, however, due to the court's conclusion that the Palmer trailers were subjected to an improper use, the court is of the opinion that the trailers were not used for an "ordinary purpose" as required by section 75–2–314 and that therefore, no breach of the implied warranty of merchantability exists. In reaching this conclusion, the court is guided by case law indicating that where recovery under section 402A of the Restatement (Second) of Torts is denied, recovery under UCC section 2–314 is also improper. *Gumbs v. International Harvester, Inc.,* 718 F.2d 88, 95 (3d Cir.1983) (holding that where the jury found no liability under section 402A but allowed recovery under an interrogatory encompassing both breach of implied warranty and merchantability and implied warranty of fitness for a particular purpose, then jury's answers to interrogatories were irreconcilable).

## IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE

In order for the plaintiff to recover on the implied warranty of fitness for a particular purpose under Mississippi Code Annotated section 75–2–315 (1972), it must establish the existence of three conditions:

(1) The seller must have reason to know the buyer's particular purpose.

(2) The seller must have reason to know that the buyer is relying on the seller's skill or judgment to furnish appropriate goods.

(3) The buyer must, in fact, rely upon the seller's skill or judgment.

*J. White & Summers Handbook of the Law under the Uniform Commercial Code* at 358 (2d Ed.1980).

The testimony before the court establishes that John Randall of Global stated the buyer's particular purpose to be that of hauling "washed rock and gravel." The plaintiff states that it informed Palmer of the general specifications as described by Lopez but that Global was relying on Palmer to determine the exact specifications and types of material to be used in manufacturing a safe and workable product. As the plaintiff urges, the doctrine that goods manufactured to a buyer's specifications do

not give rise to an implied warranty of fitness for a particular purpose applies only when the buyer furnishes precise specifications. *Aluminum Company of America v. Electro Flo Corp.*, 451 F.2d 1115, 1119 (10th Cir.1971). However, in designing the product, Palmer had a right to rely on Global's assertion that the trailers were to be used to haul washed rock. Since the court finds that Global's customer did not, in fact, haul washed rock but instead hauled a rock and dirt or clay combination, the court holds that any breach of implied warranty of fitness for a particular purpose was the result of the ultimate purchaser's use of the product for other than the stated particular purpose and that allowing recovery under section 75–2–315 would be improper.

### BREACH OF EXPRESS WARRANTY

■ The plaintiff introduced a brochure distributed by Palmer and ultimately received by John Randall depicting the Palmer frame-type trailer and stating that the trailer "[h]as the necessary design strength for all types of material hauling and dumping. Ideal for drop loading, dumping into high hoppers or spreader machines." The court concludes that these statements constitute more than the expression of an opinion by the seller or "puffing" for which liability cannot be imposed under Mississippi Code Annotated section 75–2–313 (1972). However, for an affirmation of fact or a sample or model to be considered an express warranty, the affirmation or promise made by the seller must relate to the goods and form "a part of the basis of the bargain." Miss.Code Ann. section 75–2–313(1)(a) (1972). John Randall, when questioned on direct examination as to whether he received the brochure, stated that he had not received a brochure prior to the time when he began looking for a manufacturer to fill the order placed by Lopez but that he later received a brochure, although he did not know when he received it. This leaves open the question as to whether Randall received Palmer's brochure immediately prior to or at the time of the placing of the order with Palmer for the 30 foot trailers. The cases construing section 75–2–313 almost uniformly hold that where an affirmation of fact is made subsequent to the making of the contract, the affirmation is not "part of the basis of the bargain" and it is, therefore, not an express warranty under the UCC provisions. *See, e.g., Speed Fastners, Inc. v. Newsom*, 382 F.2d 395, 397 (10th Cir.1967) (where no evidence indicating buyer relied on statement and pamphlet or any promise or description, proof failed to establish an express warranty); *Hagenbuch v. Snap-On-Tools Corp.*, 339 F.Supp. 676, 680 (D.N.H.1972) (where evidence indicating that plaintiff received catalog but no evidence that he relied on catalog description, plaintiff unable to recover for breach of express warranty); *Cuthbertson v. Clark Equipment Co.*, 448 A.2d 315, 321 (Me.1982) (no breach of express warranty or warranty against defects of new front-end loader in owner's manual not seen by buyer until after purchase since not part of basis of bargain and therefore, not express warranty under UCC 2–313); *Anderson v. Heron Engineering Co.*, 198 Colo. 391, 604 P.2d 674 (1979) (in order for statement made in seller's brochure to constitute an express warranty, buyer must have had knowledge of statement at time of making purchase). As stated in Anderson's *Uniform Commercial Code:*

> The question of whether the statements in newspaper advertisements, catalogs, circulars, etc., of the seller enter into and become a part of the contract of sale is one which depends largely on a particular circumstance. It has frequently been held that such affirmations may be the basis of express warranties, if the buyer had knowledge thereof and acted thereon.... In some cases, it has been held that representations contained in the advertisements did not become a part of the contract of sale, because the evidence showed that the buyer did not

act on the basis of such representations, but upon his own personal examination or other information.

Anderson's *Uniform Commercial Code*, section 2–313:42 (1970–1974 Cumulative Supplement).

The Second Circuit Court of Appeals, on the other hand, has stated that the precise time when an affirmation of fact is made is immaterial and that the sole question as to whether the affirmation is to be considered a part of the basis of the bargain is whether the language used is fairly considered as part of the contract. *Bigelow v. Agway, Inc.*, 506 F.2d 551, 555 n. 6 (2nd Cir.1974). In *Bigelow*, the second circuit wrote that "If language is used after the closing of the deal (as when the buyer when taking delivery asks and receives an additional assurance), the warranty becomes a modification, and need not be supported by consideration if it is otherwise reasonable and in order," citing UCC section 2–209. 506 F.2d at 555 n. 6. However, by the court's example of a buyer taking delivery after the sale and receiving an additional assurance, the court of appeals indicates that the usual contractual prerequisite of mutual assent must be found to exist for such a modification to occur. If the buyer is not aware of the affirmation of fact and there is no evidence of any reliance on such affirmation, then it would seem that the mutual assent requirement is not met such that a binding modification does not exist.

Given the express language used in UCC section 2–313 and the majority of the cases holding that the buyer must both be knowledgeable of and rely on the affirmation of fact before an express warranty is created, the court concludes that the plaintiff failed to prove by a preponderance of the evidence that the statements contained in the Palmer brochure were relied upon by Randall prior to or contemporaneously with the making of the contract between Global and Palmer. Therefore, recovery under the theory of breach of express warranty is also precluded.

## THE FOURTH AND FIFTH TRAILERS

The two undamaged Palmer trailers are still being held in storage by Global in Houston, Texas. By letter dated January 28, 1981, Global notified Palmer of its rejection of all five of the Palmer trailers sold to Global and ultimately used by Constructora-Dava in Mexico. Under Mississippi Code Annotated, section 75–2–601 (1972), the buyer may reject delivered goods if they "fail in any respect to conform to the contract...." Since the court concludes that the cause of the tipovers of the previous three Palmer trailers was the misuse of the product rather than the existence of a defect, the court holds that the rejection of the goods was improper such that Palmer is not required to retake possession of the goods or refund the purchase price for the two unused trailers.

## THE THIRD TRAILER

It is undisputed that Lawrence R. Palmer, president of Palmer Machine Works, Inc., observed and supervised the loading and dumping of the third Palmer trailer that overturned when raised to the third stage of the dumping process. The court has previously stated its opinion that the plaintiff failed to prove the existence of a defect in the design of the Palmer trailers. The court, however, is also of the opinion that Palmer was negligent in failing to object to the improper loading of the third trailer and that his company should not be able to reap the benefits of his own negligence. Although Palmer testified that he told Lopez that the third trailer would not haul the type of material loaded into the third trailer, Palmer, according to his testimony, failed to state his objection prior to the loading of the trailer. In a letter to John Randall, dated December 23, 1980, Palmer stated that when the trailer reached its third stage, that "[u]nfortunately this is where we should have lowered the trailer, but I was still trying to watch the abovementioned areas of the trailer construction to see if anything was happening to them." Palmer's stated purpose in going to Mexico was to duplicate the loading

and dumping procedure that occurred with regard to the first of the two Palmer trailers. Though Lopez testified that Palmer did not instruct any particular type of material to be placed in the third trailer but only ordered that the same material placed in the first two trailers be also placed in the third trailer, the court is of the opinion that Palmer allowed his desire to recreate the procedures resulting in the first two trailer overturns to cloud or outweigh what he knew, and later stated, to be an improper purpose. Accordingly, the court holds that Palmer is estopped from asserting the defense of misuse of the product as to the third trailer. A federal district court may exercise its inherent equitable powers to achieve justice. *Alexander v. Hill*, 707 F.2d 780, 783 (4th Cir.), *cert. denied, Syria v. Alexander*, 464 U.S. 874, 104 S.Ct. 206, 78 L.Ed.2d 183 (1983); *Goldberg v. Medtronic, Inc.*, 686 F.2d 1219, 1229 (7th Cir. 1982).

The court accordingly awards damages to the plaintiff as follows:

1. $16,275.00 representing the cost of one Palmer trailer;

2. $525.00, representing the lost profits on the sale of one Palmer trailer, less adjustment for missing tires and parts; [10]

3. $423.35, representing one-fifth of the expenses incurred by Lopez;

4. One-fifth of the freight expense of $11,600.00, or $2,320.00.

A Judgment shall be entered accordingly.

## JUDGMENT

Pursuant to a Memorandum Opinion this day issued, it is ORDERED as follows:

1. That the Plaintiff Global Truck & Equipment Co., Inc. be and it is hereby awarded judgment of and from the Defendant Palmer Machine Works, Inc. in the amount of $19,543.35 as the same pertains to trailer number 3, or the trailer that overturned in Mexico in Palmer's presence.

2. That all remaining claims of the Plaintiff Global Truck & Equipment Co., Inc. against the Defendant Palmer Machine Works, Inc. be and the same are hereby dismissed with prejudice.

3. That each party to this suit bear his respective cost.

## APPENDIX I

| Manufacturer (Length, GVW) | MAIN BEAMS Height (in.) | Width (in.) | Top Flange | Bottom Flange | Beam Spacing (in.) | Section Modulus (in.$^3$) | Cross Member Thickness (in.) | No. Cross Members |
|---|---|---|---|---|---|---|---|---|
| Gilmore (28 ft, | 16 | 5.5 | 5.5 × 0.375 | Same | 44 | 47.2 | 0.1345 (10 gage) | 7 |
| Summit (30 ft, | 16 | 5.5 | 5.5 × 0.375 | Same | 40 | 47.2 | 0.1345 (10 gage) | 9 |
| Dorsey (30 ft, | 18 | 4.0 | 4.0 × 0.5 | Same | 42 | 50.0 | 0.1345 (10 gage) | 8 |
| City (36 ft, | 16 | 5.5 | 5.5 × 0.5 | Same | — | 57.6 | 0.250 (1/4 inch) | 8 |
| Fruehauf (30 ft, | 21 | 4.0 | 4.0 × 0.5 | 4.0 × 0.75 | 42 | 65.88 | —— | 8 |
| Fontaine (32 ft, | 19 | 4.0 | 4.0 × 0.5 | Same | 37 | 53 | 0.1875 (3/16 in) | 9 |
| Palmer (30 ft, | 18 | 6.0 | 6.0 × 0.5 | Same | 38 | 68.4 | 0.1875 (3/16 in) | 9 |

**10.** Constructora-Dava paid Global $90,000.00 for the five trailers. When the trailers were returned to Global, only $84,000.00 was refunded to Constructora-Dava, $6,000.00 being subtracted for missing tires and parts.