# IN THE SUPREME COURT OF THE STATE OF IDAHO

## DOCKET NO. 48568

| | | |
|---|---|---|
| **DANIEL SHARP,** | ) | |
| | ) | |
|    **Claimant-Appellant,** | ) | |
| | ) | **Boise, December 2021 Term** |
| **v.** | ) | |
| | ) | **Opinion Filed: May 18, 2022** |
| **THOMAS BROTHERS PLUMBING,** | ) | |
| **Employer; TRUCK INSURANCE** | ) | **Melanie Gagnepain, Clerk** |
| **EXCHANGE, Surety,** | ) | |
| | ) | |
|    **Defendants-Respondents.** | ) | |
| _____ | ) | |

Appeal from the Idaho Industrial Commission.

The order of the Commission is <u>vacated</u> and the case is <u>remanded</u>.

James, Vernon & Weeks, P.A. Coeur d'Alene, for appellant. Stephen Nemec argued.

Breen Veltman Wilson, P.A, Boise, for respondent. Susan Veltman argued.

_____

BRODY, Justice.

Daniel Sharp suffered an injury to his lower back from an accident at work in 2015. After back surgery, he was repeatedly advised to lose weight by the medical providers treating his injury. However, Sharp gained considerable weight instead. The Industrial Commission found that Sharp's functional ability had diminished between 2016, when he reached maximal medical improvement (MMI) after surgery, and 2019, when his permanent disability hearing was held. The Commission attributed the worsening of Sharp's condition to his weight gain, which it held to be a superseding cause of any increase in Sharp's disability post-MMI. Accordingly, the Commission evaluated Sharp's disability based on his condition at MMI, despite our opinion in *Brown v. Home*

1

*Depot*, 152 Idaho 605, 272 P.3d 577 (2012), requiring that a claimant's disability be evaluated based on circumstances at time of the hearing. We hold that the Commission erred by departing from our holding in *Brown*, by applying an incorrect standard to determine that Sharp was not entitled to compensation due to the aggravation of his injury, and by reaching certain factual conclusions not supported by substantial and competent evidence. Therefore, we vacate the Commission's decision and remand for further proceedings.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Sharp injured his back while working as a plumber for Thomas Brothers Plumbing in late August 2015. Sharp was obese at the time of his accident, standing five feet six inches tall and weighing 250 pounds. The day after his accident, Sharp was diagnosed with a large vertebral disc herniation at the L5-S1 level of his spine and referred to Dr. William Ganz, a neurosurgeon. Sharp was examined by Dr. Ganz a week and a half later. Dr. Ganz found that the herniation was causing early symptoms of cauda equina syndrome, a condition which can cause permanent paralysis. Dr. Ganz recommended immediate surgery and performed a hemilaminectomy and microdiscectomy the same day. Following surgery, Sharp complained of persisting pain in both legs and his lower back.

Sharp was discharged from the care of Dr. Ganz in January 2016. At the time of discharge, Sharp weighed approximately 280 pounds. Dr. Ganz had advised Sharp before undergoing surgery that he needed to lose weight to avoid complications, and he expressed disappointment that Sharp had gained weight in the intervening months instead.

Sharp began physical therapy shortly after his surgery and was examined and treated by several medical providers over the next several months. All providers expressed concern about Sharp's obesity and recommended he lose weight. In May 2016, Sharp began ongoing pain management treatment with Denise Love,  a nurse practitioner.

A little more than a year after his surgery, Sharp was seen by Dr. Rodde Cox, a physiatrist, for an independent medical evaluation (IME) at the request of Defendants. Dr. Cox did not record Sharp's weight in his IME report but diagnosed Sharp with morbid obesity. Four days earlier, Sharp's weight had been recorded by Nurse Love as 323 pounds. Dr. Cox also diagnosed lumbosacral radiculopathy caused by the workplace injury, symptom magnification, chronic pain syndrome, and probable depression.

Dr. Cox concluded that Sharp had reached maximal medical improvement (MMI) as of the time of the IME and rated Sharp's permanent physical impairment (PPI) at 14 percent of the whole person. Dr. Cox also assessed medium-duty work restrictions of lifting no more than 50 pounds occasionally, and avoiding repetitive bending, twisting, stooping, and prolonged exposure to low frequency vibration.

For the next year, Sharp's medical care consisted mainly of pain management with Nurse Love. Throughout her treatment of Sharp, Nurse Love advised Sharp to lose weight and Sharp consistently reported that he was trying to do so, though his efforts were unsuccessful.

In November 2017, Sharp was again examined by Dr. Cox at the request of Defendants. Dr. Cox's diagnoses and opinion on work restrictions were unchanged from his earlier report. Again, Dr. Cox did not record Sharp's weight, but he noted that Sharp's obesity appeared to have increased since his 2016 IME. Five weeks earlier, Nurse Love recorded Sharp's weight as 334 pounds.

Sharp filed a workers' compensation complaint in April 2018, claiming entitlement to additional medical benefits, total permanent disability benefits, and attorney fees. Sharp requested an IME from Dr. John McNulty. Dr. McNulty diagnosed continuing lumbosacral radiculopathy and "failed back syndrome." Dr. McNulty recorded Sharp's weight as 362 pounds. Dr. McNulty agreed with Dr. Cox's 14 percent impairment rating but assessed significantly more restrictive work restrictions—no more than four hours work per day, no more than five minutes continuous walking or standing, no more than 20 minutes continuous sitting, no lifting of more than ten pounds from waist level, no lifting at all from floor level, and no stooping, bending, kneeling, crawling, or climbing.

A hearing to determine Sharp's permanent disability rating was held before Industrial Commission referee Alan Taylor in March 2019. Each party submitted a report from a vocational rehabilitation expert assessing Sharp's employment prospects. While there were some differences between the methodologies and assumptions of the experts, both agreed that Sharp was totally disabled under the 2019 work restrictions offered by Dr. McNulty. Using the work restrictions first offered by Dr. Cox in 2016, Defendants' expert calculated Sharp's disability as 21 percent, inclusive of the 14 percent PPI from the industrial injury, while Sharp's expert calculated his disability at 43 percent, inclusive of PPI. Additionally, Dr. Cox, Dr. McNulty, and Nurse Love testified in post-hearing depositions.

In a decision issued in September 2020, the Commission determined that Defendants were liable for certain unpaid medical expenses, though not for dietician services to help Sharp lose weight. It also found Sharp's post-accident weight gain was "a change in Claimant's condition not caused by his industrial accident," which decreased his functional ability and resulted in the difference between Dr. Cox's restrictions and Dr. McNulty's restrictions. Therefore, the Commission evaluated Sharp's disability using Dr. Cox's restrictions because it believed these reflected Sharp's disability in 2016 when he reached MMI. The Commission also found the opinion of Defendants' vocational expert was more persuasive than the opinion of Sharp's expert and, thus, concluded Sharp's permanent disability was 21 percent.

After the denial of a motion for reconsideration, Sharp timely appealed to this Court.

## II. STANDARD OF REVIEW

When reviewing a decision of the Industrial Commission, this Court exercises free review over questions of law, but reviews questions of fact only to determine whether substantial and competent evidence supports the Commission's findings. Substantial and competent evidence is relevant evidence which a reasonable mind might accept to support a conclusion. It is more than a scintilla of proof, but less than a preponderance. All facts and inferences will be viewed in the light most favorable to the party who prevailed before the Industrial Commission.

*Tenny v. Loomis Armored US, LLC*, 168 Idaho 870, 877, 489 P.3d 457, 464 (2021) (quoting *Morris v. Hap Taylor & Sons, Inc.*, 154 Idaho 633, 636, 301 P.3d 639, 642 (2013)).

## III. ANALYSIS

Sharp has brought a permanent disability in excess of impairment claim. The rating of permanent disability "is an appraisal of the injured employee's present and probable future ability to engage in gainful activity as it is affected by [1] the medical factor of permanent impairment and [2] by pertinent nonmedical factors . . . ." I.C. § 72-425. The term "permanent impairment" is defined as "any anatomic or functional abnormality or loss after maximal medical rehabilitation has been achieved and which abnormality or loss, medically, is considered stable or nonprogressive at the time of evaluation." I.C. § 72-422. Nonmedical factors broadly include circumstances that impair a claimant's ability to compete in the labor market:

In determining percentages of permanent disabilities, account shall be taken of the nature of the physical disablement, the disfigurement if of a kind likely to limit the employee in procuring or holding employment, the cumulative effect of multiple injuries, the occupation of the employee, and his age at the time of accident causing the injury, or manifestation of the occupational disease, consideration being given to the diminished ability of the afflicted employee to compete in an open labor

market within a reasonable geographical area considering all the personal and economic circumstances of the employee, and other factors as the commission may deem relevant . . . .

I.C. § 72-430(1).

The degree of Sharp's permanent impairment is not at issue. Dr. Cox and Dr. McNulty agreed that Sharp's disc herniation and radiculopathy resulted in a permanent impairment of 14 percent under the American Medical Association's *Guides to the Evaluation of Permanent Impairment, Sixth Edition*. Consistent with these opinions, the Commission found that Sharp's PPI (permanent partial impairment) was 14 percent, and neither party disputes the Commission's determination.

In determining Sharp's disability in excess of PPI (i.e., disability attributable to non-medical factors), the Commission relied on the opinion of Nancy Collins, Defendants' vocational rehabilitation expert. Collins' opinion regarding Sharp's labor market access depended on which set of work restrictions were applied. Under Dr. Cox's medium duty restrictions, she concluded Sharp was 21 percent disabled; under Dr. McNulty's far more limiting restrictions, she concluded he was "realistically totally disabled."

The Commission applied the medium-duty work restrictions recommended by Dr. Cox and concluded Sharp was 21 percent disabled:

> Based on Claimant's impairment of 14% of the whole person due to his industrial accident and his 50-pound medium duty work restrictions, and considering his non-medical factors including his age of 39 at the time of the accident and 42 at the time of the hearing, formal education, transferable skills, and inability to return to his previous position as a plumber, Claimant's ability to engage in regular gainful activity in the open labor market in his geographic area has been reduced. The Commission concludes that Claimant has suffered a permanent disability of 21% inclusive of his 14% whole person permanent impairment.

Notably, the Commission used Dr. Cox's restrictions even though it observed that Dr. McNulty's "more recent restrictions may accurately reflect Claimant's functional ability as of the date of the hearing." The Commission acknowledged that Idaho Code section 72-425 provides that a disability evaluation is an assessment of a claimant's "present" ability to obtain suitable employment. Furthermore, it acknowledged our holding in *Brown v. Home Depot*, 152 Idaho 605, 272 P.3d 577 (2012), that the statute's use of the word "present" requires a disability evaluation to take account of "the claimant's personal and economic circumstances at the time of the hearing, not at some earlier time . . . ." *Id.* at 609, 272 P.3d at 581.

5

Nevertheless, the Commission declined to follow *Brown*. The Commission reasoned "[i]t is appropriate to evaluate Claimant's disability based on those restrictions given to him as of . . . October 28, 2016, [the] date of medical stability by Dr. Cox," because (1) it believed that the difference between Dr. Cox's restrictions and Dr. McNulty's was "reasonably explained by the passage of time and . . . Claimant's 120-pound post-accident weight gain," and (2) Sharp's weight gain was a "subsequent super[s]eding event" that relieved Defendants of liability for any disability attributable to it.

Sharp argues that the Commission erred by disregarding *Brown* and section 72-425 and by refusing to consider his obesity as a non-medical factor under section 72-430. While we conclude that Sharp's argument under section 72-430 is unavailing, we agree that the Commission erred by not evaluating his disability at the time of the hearing as required by section 72-425. Therefore, remand is necessary for a new disability evaluation. Additionally, we hold the Commission erred in its causation analysis, and we address these errors for guidance on remand.

### A. The Commission did not err by "refusing" to consider obesity as a non-medical factor because Sharp did not contend obesity itself was an impediment to his employment.

Idaho Code section 72-430 lists several relevant non-medical factors and broadly provides that the Commission must consider "all the personal and economic circumstances" affecting a claimant's ability to obtain gainful employment. Sharp's first argument is that his obesity is a relevant non-medical factor, which the Commission "expressly refused to consider."

Sharp's argument misses the mark. Sharp was obese at the time he was injured, yet there has been no contention he was disabled to any degree before his accident. Sharp gained considerable weight between his accident and the time of the hearing, and we recognize his argument that "[r]ealistically, no employer was ever going to hire" him—regardless of his work restrictions—when he weighed 370 pounds. However, Sharp made no argument below that obesity itself was an impediment to his employment, whether he weighed 250 or 370 pounds.

If Sharp had made such an argument, it would not have been supported by evidence in the record. Clearly, Sharp was not rejected for any employment on account of his weight because he did not apply for any jobs after his accident. Further, nothing in the report of either vocational expert supports the claim that his obesity was likely to be a barrier to employment in the way he suggests. We do not doubt that some employers might disfavor hiring obese people, whether because of real or perceived physical limitations, or reasons entirely apart from a claimant's ability

6

to perform a job. *See* Jessica L. Roberts, *Healthism and the Law of Employment Discrimination*, 99 Iowa L. Rev. 571, 579–89 (2014) (noting that some businesses decline to hire obese people because of fear of increased insurance costs, concern about business image in health-related fields, and stigma against obese people generally). However, the Commission did not err by failing to consider potential effects of Sharp's obesity that were neither argued below nor supported by evidence.

That said, in dicta, the Commission stated that because obesity is a "temporary condition," it is "not a basis for PPI or disability." The parties have devoted considerable argument to the question of whether this is a correct statement of the law. Further, in a footnote in the Commission's decision, the Commission acknowledged that its approach to the issue has been inconsistent to the point of contradiction over the years. Accordingly, it is appropriate for us to bring clarity to the issue.

We are skeptical of a broad-brush characterization of obesity as "temporary," since common experience reveals that obesity is anything but temporary for many people. Regardless, the Commission misstated the law because the impermanence of a non-medical factor does not exclude it from consideration. For example, a claimant's educational attainment is impermanent because one can always, in theory, obtain more education. However, it is well established that a claimant's lack of education is an appropriate non-medical factor to consider in evaluating disability. *Bennett v. Clark Hereford Ranch*, 106 Idaho 438, 441, 680 P.2d 539, 542 (1984). There is no reason to treat obesity differently. If it affects a claimant's ability to secure and retain employment, it must be considered by the Commission as a non-medical factor. To the extent that a claimant's obesity may be "temporary," a disability evaluation "is an appraisal of the injured employee's present *and probable future ability* to engage in gainful activity . . . ." I.C. § 72-425 (emphasis added). Thus, if the Commission concludes—based on evidence—that a claimant's obesity can reasonably be expected to change, the appropriate course is to account for that change in the evaluation, not to disregard his or her obesity entirely. *Cf. Ball v. Daw Forest Prod. Co.*, 136 Idaho 155, 162, 30 P.3d 933, 940 (2001) (affirming a less than total disability rating where, despite the non-medical factor of the claimant's alcoholism and present inability to drive, the claimant's ability to eventually drive for commuting purposes was supported by evidence in the record).

7

We express no opinion whether obesity may also be a basis for disability as a permanent impairment. This issue has not been addressed by the parties and will not arise on remand because the parties agree that the Commission correctly determined Sharp's PPI. Therefore, we decline to address the question now.

**B. The Commission erred by evaluating Sharp's disability as of the time he reached MMI, rather than at the time of the hearing.**

In his second argument, Sharp contends the Commission erred by using Dr. Cox's restrictions to "reach[] back into 2016" and conduct his disability evaluation based on his condition at MMI, contrary to Idaho Code section 72-425 and *Brown*. We agree.

In *Brown*, the claimant suffered an industrial injury in 2001, achieved MMI in 2005, and had a disability hearing before the Commission in 2009. *Id.* at 606, 272 P.3d at 578. Vocational rehabilitation experts were retained by the parties, and each evaluated the claimant's employability in the relevant geographic labor market at the time of the hearing. *Id.* The Commission retained its own expert, who evaluated the claimant's employability as of the time he reached MMI in 2005. *Id.* Ultimately, the Commission determined the claimant's disability based on the 2005 labor market. *Id.*

We held that the Commission erred by doing so because section 72-425 requires a "present" determination of a claimant's disability:

> Under I.C. § 72–425, the permanent disability rating is a measure of the claimant's "present and probable future ability to engage in gainful activity." The word "present" implies that the Commission is to consider the claimant's ability to work as of the time evidence is received. There is no "present" opportunity for the Commission to make its determination apart from the time of hearing. . . . [I]t is the claimant's personal and economic circumstances at the time of the hearing, not at some earlier time, that are relevant to the disability determination. Therefore, we hold that the relevant labor market for evaluating the non-medical factors under I.C. § 72-430 and in determining a claimant's [disability] is the labor market at the time of the hearing.

*Brown*, 152 Idaho at 609, 272 P.3d at 581 (citation omitted). We then went on to observe "that this holding, if not qualified, may create an incentive for litigants to seek to expedite or delay the hearing in order to take advantage of changing economic conditions." *Id.* Therefore, "in an instance where the Commission perceives that a party has taken an action that has the effect of manipulating the outcome of a disability determination, the Commission possesses the authority to disregard the effect of that action." *Id.*

8

Here, noting that we held some circumstances justify a departure from the general rule of *Brown*, the Commission concluded departure was appropriate because Sharp's weight gain was a "subsequent super[s]eding event" that caused an increase in his disability post-MMI. According to the Commission, "Claimant's disability should not be evaluated based on the restrictions that exist as of the date of the hearing" because doing so would "saddle Defendants with liability for a subsequent condition we have determined is not related to the subject accident."

Defendants argue that the Commission did not err under *Brown* because "causation is an issue whenever entitlement to benefits is at question" and it correctly determined that Defendants were not responsible for the consequences of Sharp's weight gain. Undoubtedly, causation is relevant in determining the extent of Defendants' liability—though, as we will explain later, the Commission applied an incorrect standard in its causation analysis and its decision was based upon factual findings unsupported by competent evidence. However, Defendants' argument is beside the point. The thrust of Sharp's argument under section 72-425 is about *how* the Commission conducted its disability evaluation, not *what* it ultimately decided.

We agree with Sharp that the Commission erred in how it conducted the disability evaluation. The exception we recognized to the general rule in *Brown* applies when a claimant has intentionally sought to manipulate the outcome of the evaluation. *See Brown*, 152 Idaho at 609, 272 P.3d at 581. However, nothing of the sort was at issue here. Moreover, there was no need for the Commission to disregard the rule of *Brown*. Even if Defendants are not liable for the total extent of Sharp's disability, the Commission can still comply with *Brown* because a claimant's disability is not synonymous with a defendant's liability.

When events following a compensable injury increase the degree of a claimant's disability, the correct analysis proceeds in two steps. First, as *Brown* dictates, the Commission must evaluate a claimant's disability considering the claimant's personal and economic circumstances at the time of the hearing. Second, if the Commission determines (applying the standard we set out below) that an employer is not liable for some portion of the claimant's overall disability, the Commission must apportion to the employer only that disability for which the employer is liable. This is a process already familiar to the Commission and practitioners because it is substantially the same as the two-step inquiry applicable where the liability of prior employers or the Idaho Special Indemnity Fund (ISIF) is at issue. *See e.g.*, *Horton v. Garrett Freightlines, Inc.*, 115 Idaho 912, 917, 772 P.2d 119, 124 (1989).

9

For these reasons, the Commission erred by failing to evaluate Sharp's disability at the time of the hearing and a remand is necessary.

**C. The Commission applied an incorrect standard for determining when an employer is relieved of liability for the aggravation of a compensable injury or a secondary injury that flows from a compensable injury.**

Because it is necessary for the Commission to conduct a new disability evaluation consistent with the workers' compensation law, we address errors in the Commission's causation analysis so that they are not repeated on remand.

1. Tort concepts of causation cannot be mechanically applied to workers' compensation claims.

Our workers' compensation law provides that employers are liable for compensation to employees "on account of an injury or occupational disease." I.C. § 72-211. "Injury" is a defined term meaning "a personal injury caused by an accident arising out of and in the course of any employment covered by the workers' compensation law." I.C. § 72-102(17)(a). Therefore, an employer is only liable to pay compensation for disability causally linked to an injury or occupational disease occurring in connection with its employment of a claimant. However, once the initial requirement of work-connection is established, the law does not expressly address how far employer liability extends. More specifically, the workers' compensation statutes do not address whether, or in what circumstances, an employer is relieved of liability when a subsequent, non-work-connected cause aggravates a compensable injury or combines with it to bring about a secondary injury.

In tort law, whether a subsequent event terminates the legal responsibility of an otherwise liable party is evaluated under the doctrine of superseding causes. *See Cramer v. Slater*, 146 Idaho 868, 877, 204 P.3d 508, 517 (2009) (quoting *Mico Mobile Sales and Leasing, Inc. v. Skyline Corp.*, 97 Idaho 408, 411, 546 P.2d 54, 57 (1975) ("A superseding cause is an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about.")). Several factors are considered to determine if a tortfeasor will be relieved of liability by a superseding cause, but the general concept is that a later event must be so significant in bringing about a plaintiff's ultimate injury that the original tortfeasor can no longer be deemed at fault for the harm caused. *See id.*

But this is not a tort case. We take this opportunity to emphasize a critical point: workers' compensation law is not synonymous with, nor a branch of, tort law. *Maravilla v. J.R. Simplot Co.*,

161 Idaho 455, 462, 387 P.3d 123, 130 (2016) (stating that the Workers' Compensation Act was "specifically intended to remove industrial accidents from the common law tort system"). While there are obvious resonances between tort and workers' compensation law—both seek relief for the injured—they are rooted in different soil. The aim of tort law is to remedy private wrongs, to settle accounts between tort victims and tortfeasors. Thus, in tort, the fundamental test of liability is fault—i.e., whether the defendant's wrongful conduct is to blame for the plaintiff's injury.

In workers' compensation law, an employer's fault is not a precondition of liability. This is because the workers' compensation system is ultimately about allocating costs, not remedying wrongs. Our workers' compensation law was based upon a model law drafted by the Council of State Governments almost 60 years ago. *See Gomez v. Crookham Co.*, 166 Idaho 249, 257, 457 P.3d 901, 909 (2020). According to the Council's commentary on the model law, the purpose of the workers' compensation system is to provide "prompt payment of benefits regardless of fault or blame" to employees injured in the course of covered employment "based on the theory that the cost of work accidents is a legitimate part of the cost of production." COUNCIL OF STATE GOV'TS, WORKMEN'S COMPENSATION AND REHABILITATION LAW 1 (reprint from SUGGESTED STATE LEGISLATION) (1963). Accordingly, the essential precondition of liability under the workers' compensation law is a causal connection to an injury sustained in the course of covered employment. I.C. §§ 72-211; 72-102(17)(a).

It is inappropriate to mechanically apply tort concepts of causation in the workers' compensation context. It is true, however, that one case predating the enactment of our current workers' compensation scheme would suggest otherwise. In *Linder v. City of Payette*, 64 Idaho 656, 135 P.2d 440 (1943), we stated that "[w]e accept as correct appellant's proposition of law that the definition and determination of 'proximate cause' in the field of torts is applicable" in workers' compensation cases. *Id.* at 657–58, 135 P.2d at 441. Inasmuch as *Linder* conflicts with our decision today, it is overruled.

Here, the Commission did not cite to relevant authority nor explain the standard it applied to conclude that Sharp's weight gain was a "subsequent super[s]eding event" that relieved Defendants of liability for the full extent of Sharp's disability at the time of the hearing. However, the apparent focus of the Commission's analysis was that Defendants were not at fault for Sharp's worsened condition. Aside from its reference to the doctrine of superseding causes—a tort doctrine rooted in fault—the Commission stated that the full extent of Sharp's harm could not be "fairly"

11

attributed to Defendants and opined that without its superseding cause analysis Defendants would be "saddled" with unfair liability. Inasmuch as the Commission was concerned with Defendants' fault rather than a work connection as the basis of liability, its decision was fundamentally inconsistent with the principles of workers' compensation law.

2. <u>The correct standard for determining whether Defendants are liable for the aggravation of Sharp's injury is whether he acted with rash or deliberate disregard of the risk that additional harm would flow from his compensable injury.</u>

Though the Commission did not explain the standard it applied to determine Sharp's weight gain was an event that relieved Defendants of liability, it has, at times, referenced the doctrine of compensable consequences, as described by Larson's Workers' Compensation Law, a leading treatise in the field of workers' compensation. *See, e.g.*, *Pickens v. Petersen Stampede Dodge,* 2013-032785, 2020 WL 7260346, at \*18 (Idaho Ind. Com. Nov. 12, 2020). According to Larson's "[t]he basic rule is that a subsequent injury, whether an aggravation of the original injury or a new and distinct injury, is compensable if it is the direct and natural consequence of a compensable injury," unless an employee's own post-injury conduct becomes an "independent intervening cause" of harm. 1 LARSON'S WORKERS' COMPENSATION LAW § 10.01.

This Court has not before discussed the doctrine of compensable consequences in detail. We discuss it now to explain the standard that should have been applied below and must be applied on remand. Though we depart from Larson's rule in certain respects, it is a helpful starting point for explaining the applicable standard in Idaho. There are two parts to Larson's rule, which we address in turn below.

a. *The consequences of compensable injuries are presumptively compensable.*

The first part of Larson's rule is broadly inclusive. That is, once an injury is shown to arise out of and in connection with covered employment, all "direct and natural" consequences flowing therefrom are included in the scope of the employer's liability. *See* 1 LARSON'S WORKERS' COMPENSATION LAW, Ch. 10, *Synopsis* ("When the primary injury is shown to have arisen out of and in the course of employment, every natural consequence that flows from the injury likewise arises out of the employment . . . ."). The Commission has described this basic principle as "axiomatic." *See Miller-O'Brien v. Cygnus, Inc.*, 2012-005159, 2017 WL 6949780, at \*14 (Idaho Ind. Com. Dec. 20, 2017).

We agree with Larson's and the Commission that employer liability extends to the secondary consequences of compensable injuries. As we have explained, the basic test of employer

12

liability is a causal connection between covered employment and a claimant's injury. Once this connection is established, our workers' compensation statutes do not distinguish between primary and secondary consequences, and to infer such a distinction would be inconsistent with the mandate that the law be interpreted liberally to ensure full compensation for employees. *See* I.C. § 72-201.

However, we do not find Larson's use of the phrase "direct and natural consequences" to be helpful, and we discourage its use in describing the scope of employer liability in Idaho. To begin, although the terms "direct" and "natural" are frequently used, they are not clearly defined in Larson's, nor in any decision of the Commission of which we are aware. Moreover, in discussing the doctrine of compensable consequences, Larson's draws upon numerous cases where employers are found liable for secondary harms, even though they arise in ways that are unusual, unexpected, or remote in time from the primary injury. *See, e.g.*, *Ball v. Wyoming Workers' Safety and Comp. Div.*, 239 P.3d 621 (Wyo. 2010) (employee entitled to benefits where spinal cord stimulator used to treat pain resulting from a compensable injury malfunctioned, causing employee to suddenly stand up and sustain a hernia); *Marmino v. City of Crowley*, 829 So.2d 1117 (Ct. App. La. 2002) (employee's survivor entitled to benefits where steroids prescribed to treat compensable liver disease masked symptoms of non-work-connected gallbladder disease, thereby delaying treatment and resulting in the employee's death); *Brady v. Best Buy Co.*, No. COA17-315, 2017 WL 4365176 (Ct. App. N.C. Oct. 3, 2017) (unpublished) (employee's survivor entitled to benefits where employee died from accidental overdose four years after compensable injury by taking a cocktail of drugs prescribed to treat injury-related depression and chronic pain). While we need not and do not express an opinion on the merits of these decisions, they illustrate that the terms "direct" and "natural"—at least as commonly defined—are inapt to describe the range of consequences commonly found compensable.

Furthermore, "direct" and "natural" invite confusion with inapplicable tort concepts of liability—particularly the foreseeability of harm. Indeed, the Commission has occasionally mis-cited Larson's for the proposition that a secondary harm must be the "natural and *probable* consequence" of an initial injury to be compensable. *See, e.g.*, *Miller-O'Brien*, 2017 WL 6949780, at *14. This formulation is antithetical to the principles of workers' compensation law. At bottom, whether a secondary injury is a "probable consequence" of an initial injury—in other words, a

13

foreseeable consequence—is irrelevant. What matters is whether there is a demonstrable causal connection between the compensation sought and the work-connected injury.

Here, there is no question that the full extent of Sharp's injury and resulting disability are causally connected to his work accident. While the Commission separated Sharp's disability into two portions—(1) disability attributable to his initial injury and (2) additional disability attributable to its aggravation—both are causally connected to his accident. In oral argument, Defendants contended they should only be liable for the first portion of Sharp's disability because the different portions were like injuries to different parts of his body:

> If the right hand is injured [at work], [an employer] pay[s] for that. If two years after that injury the claimant breaks his left leg, they don't have strict liability for the left leg—it's the right hand. So, in this case, had the obesity arisen from—and if there had been medical evidence that the obesity was related to—the compensable injury, then we would owe that.

But this is not a situation involving a right hand and a left leg. The only part of Sharp's body that has been injured is the L5-S1 level of his spine. Nor is this a situation involving a separate, subsequent injury. While Defendants have argued that Sharp exaggerated his symptoms, there has not been a contention—nor could there reasonably be one based on the record—that Sharp's symptoms flowing from his work accident ever resolved. Instead, both parties and the Commission have treated Sharp's worsened condition as an *aggravation* of an injury that all agree is compensable. Thus, there is no question that there is a demonstrable causal connection between Sharp's employment and both portions of his disability.

We recognize that the Commission stated Sharp's weight gain was "unconnected to the subject accident," a statement Defendants emphasize in their arguments. However, if taken literally, this finding is untenable and would have to be set aside as contrary to any rational view of the evidence. *See Mazzone v. Texas Roadhouse, Inc.*, 154 Idaho 750, 758, 302 P.3d 718, 726 (2013) (holding that factual determinations not supported by substantial and competent evidence "will be set aside on appeal"). To support its finding, the Commission relied on testimony from Dr. Cox to the effect that diet is a *larger factor* in causing obesity than inactivity. What Dr. Cox did not say in his testimony, and what no person reasonably could say, is that inactivity is *not a factor* in causing obesity. A person's weight is affected by both, and it is beyond dispute that Sharp's ability to engage in physical activity was affected by his accident.

14

Because these facts were surely known to the Commission, the only reasonable way to interpret its statement is through the lens of proximate causation. That is, although Sharp's work accident was an *actual* cause of his increasing obesity (and its consequences), the Commission evidently concluded it was "unconnected" in a legal sense because Sharp's dietary choices were more to blame for his increased weight than the reduction in his activity due to the accident. Thus, we understand the Commission's holding as a reflection of its misplaced focus on Defendants' lack of fault and erroneous conflation of tort and workers' compensation law principles.

In any event, whether Defendants are liable for the full consequences of Sharp's *back injury* does not turn on whether his *weight gain* was caused by the accident. As we have already explained, there are not two injuries in this case but a single, initially compensable injury that has been aggravated. For the aggravation of a compensable injury to also be compensable, it is not necessary that the cause of aggravation arise out of employment. For example, if the aggravation of Sharp's injury had been caused by a sneeze while he sat at home, it would not matter whether there was a connection between the sneeze and Sharp's employment; Defendants would remain liable. *See* 1 LARSON'S WORKERS' COMPENSATION LAW § 10.02 (stating that aggravation of a compensable injury by a sneeze is "clearly" compensable).

Because a sneeze is involuntary, it presents a somewhat different situation than where an employee's volitional conduct is involved, a matter we discuss next. However, this example illustrates the point that the aggravation of a compensable injury can remain compensable despite a lack of connection between a work accident and the subsequent event causing aggravation. To the extent that Defendants' have focused on the purported lack of connection between Sharp's accident and his weight gain, their arguments are misplaced.

> b. *An employer is not liable for the aggravation of a compensable injury or a secondary injury if it results from an employee's rash or deliberate disregard for a material risk the harm will occur.*

The second part of Larson's rule creates an exception to employer liability where an employee's own conduct constitutes an "independent intervening cause" of additional harm. 1 LARSON'S WORKERS' COMPENSATION LAW § 10.01. In such a case, the employer's fault remains irrelevant as a basis of liability, but an *employee's* fault becomes relevant to the question of far liability may extend. Larson's illustrates the point that there must be some limit to employer liability with an example involving an injured hand and a recreational boxing match. *Id.* at § 10.04. In *Kill v. Industrial Commission*, 152 N.W. 148 (Wis. 1915), the claimant's hand was nearly healed

from an industrial injury when, against his doctor's advice, he voluntarily engaged in a boxing match. *Id.* at 148–49. The boxing match caused an infection in the claimant's hand to flare up, and he lost bones in his hand and wrist as a result. *Id.* The claimant was denied additional compensation. *Id.* at 149–50.

Larson's describes the boxing match scenario as a "conveniently extreme" example of culpable employee conduct for which an employer should not be held liable. *Id.* at § 10.05. However, it notes that most cases are not so easy, and no uniform rule has emerged by which courts determine that employee conduct is sufficiently culpable to cut off employer liability. *Id.* After surveying decisions across jurisdictions, Larson's ultimately suggests a two-tiered rubric where the level of fault necessary to break the causal chain depends on a fact-intensive inquiry into the nexus between the compensable injury and the particular activity the employee was engaged in at the time of the aggravation or secondary injury. *Id* at § 10.05. Where there is no nexus, Larson's maintains that negligence is sufficient to break the causal chain; where the nexus is close, it suggests that the chain will not be broken except by "intentional conduct which may be regarded as expressly or impliedly prohibited by the employer." *Id.*

We hold that an employee's fault is relevant to the scope of compensable consequences, but we decline to adopt Larson's approach. Larson's rule is extrapolated from dozens of cases across jurisdictions. The intricacies of its analysis may be useful in harmonizing these cases and stating an abstract rule. However, we do not think they allow for a workable rule of decision.

That said, Larson's discussion of negligence in workers' compensation cases is illuminating. According to Larson's, the conduct found to be negligent often involves "undertaking a line of action with knowledge of the risk" that it will lead to additional harm due to the compensable injury. *Id.* at § 10.06(3). At its most basic, negligence means the failure to exercise due care. However, more than this is involved in Larson's description. When an injured employee undertakes a line of action with knowledge of a particular risk, this amounts to a deliberate disregard of the risk of harm. In other words, a heightened degree of negligence.

By its terms, our workers' compensation law is intended to provide "sure and certain relief for injured workmen and their families and dependents . . . ." I.C. § 72-201. "When interpreting the [Idaho Workers' Compensation] Act, we must liberally construe its provisions in favor of the employee in order to serve the humane purpose for which it was promulgated." *Fuentes v. Cavco*

16

*Indus., Inc.*, No. 48419, 2022 WL 38420 (Idaho Jan. 5, 2022) (quoting *Wernecke v. St. Maries Joint Sch. Dist. No. 401*, 147 Idaho 277, 282, 207 P.3d 1008, 1013 (2009)).

Consistent with these principles, we hold that a heightened negligence standard must apply before an employer is relieved of liability for the consequences flowing from a compensable injury. Occasional lapses in judgment are a fact of the human condition. If, by happenstance, a lapse worsens a compensable injury or combines with a compensable injury to bring about new harm, cutting off employer liability would fail to ensure the "sure and certain relief" that the workers' compensation law is meant to provide. Therefore, we hold that the consequences flowing from a compensable injury are also compensable unless they result from an employee's conduct that is undertaken with rash or deliberate disregard of a material risk that the harm will occur.

3. <u>On remand, the Commission must consider all the relevant facts when determining whether Sharp deliberately disregarded the risk that his weight gain would aggravate his compensable injury.</u>

The Commission's decision to disregard Dr. McNulty's work restrictions rested on its conclusion that Defendants were not at fault for the aggravation of Sharp's injury. On remand, the Commission must consider the degree of Sharp's fault, not Defendants'. In doing so, it must consider all the relevant facts. In this regard, it is relevant that Sharp was repeatedly advised to lose weight but gained a large amount of weight instead. However, any efforts Sharp took to control his weight must also be considered by the Commission.

To that end, we note that the Commission stated in its decision that "Claimant, having ignored his surgeon's express warning and the recommendations of virtually every medical provider that has examined him since his accident, may now suffer permanent nerve damage due to his 120-pound post-accident weight gain." Insofar as this constitutes a factual finding that Sharp "ignored" medical advice, it is not supported by competent evidence and must be set aside. *Mazzone*, 154 Idaho at 758, 302 P.3d at 726.

No evidence supports that Sharp "ignored" medical advice because it does not appear he received any meaningful advice about weight management to ignore. Certainly, there were admonitions that Sharp lose weight, but nowhere does it appear he received any medical guidance. Notably, Nurse Love logged in August 2017 that she told Sharp she would look for a dietician for him to consult with. In the record of his next visit, Love reported that Sharp told her he had inquired with the Surety about consulting with a dietician and was denied coverage. As recorded in Love's notes:

At last visit we also discussed his weight again. He reportedly has been trying several different things to lose weight without success. I had tried to send him to [a] dietician for consult to have this evaluated as clearly his weight is a problem in terms of contributing to his LBP [lower back pain]. This was denied by his insurance. He reports since his accident and surgery, with his limited mobility, he has gained weight. With his limited mobility, he only has dietary changes with which to combat his obesity. It is truly unfortunate that this service has been denied as clearly he needs help, [but] that is beyond the scope of this office visit.

It is also notable that there is significant evidence in the record that Sharp made attempts to lose weight, despite the opposite trend. For example, Sharp reported to Dr. Ganz shortly after his surgery that he was restricting his calories to 1200 per day. In September 2016, Sharp told Nurse Love that he had changed his diet to lose weight and Love reported that he seemed motivated in his efforts. In October 2016, he told Nurse Love that he was on a plan with his wife to lose weight. In March 2017, Sharp told Nurse Love he was cutting out snacks, working on portion control, and his wife had been looking up recipes to help them eat better. And in July 2017, Sharp told Nurse Love that he was trying the keto diet.

Ultimately, the steps that Sharp took to manage his weight, and the guidance and resources that were available to him, are factual matters for the Commission to determine, not this Court. However, in considering whether Sharp's conduct leading to his weight gain was undertaken with a rash or deliberate disregard of the risk that he would aggravate his back injury, we emphasize that the Commission must consider all the relevant facts.

4. <u>On remand, if the Commission determines that Sharp's conduct leading to his weight gain was undertaken with a rash or deliberate disregard of the risk that he would aggravate his back injury, the Commission must re-determine the extent of his disability for which Defendants are liable.</u>

The Commission relied on Dr. Cox's restrictions to determine the portion of Sharp's disability for which Defendants were liable. It did so because it found that the difference between Dr. McNulty's restrictions and Dr. Cox's restrictions accurately reflected the worsening of Sharp's condition caused by his weight gain. Implicit in this determination is a finding that Dr. Cox's restrictions accurately reflected Sharp's disability *before* the weight gain. We set aside both these determinations because they are not supported by substantial or competent evidence.

The Commission's findings of fact may not be set aside by this Court unless they "are not based on any substantial competent evidence." I.C. § 72-732(1). "Substantial and competent evidence is relevant evidence which a reasonable mind might accept to support a conclusion."

18

*Tenny v. Loomis Armored US, LLC*, 168 Idaho 870, 877, 489 P.3d 457, 464 (2021) (quoting *Morris v. Hap Taylor & Sons, Inc.*, 154 Idaho 633, 636, 301 P.3d 639, 642 (2013)).

At the outset, we reject Defendants' argument that the Commission relied on Dr. Cox's restrictions because it found his opinion was more credible than Dr. McNulty's. The Commission stated that it relied on Dr. Cox's restrictions because it believed they reflected Sharp's physical condition "at the time Claimant reached maximum medical improvement and prior to the majority of his 120-pound post-accident weight gain." As such, it did not hold that Dr. Cox's opinion was more credible than Dr. McNulty's; it simply determined that Dr. McNulty's opinion was irrelevant.

Turning to those opinions, no reasonable mind could conclude from the evidence that the difference between the two doctors' recommended work restrictions was due to Sharp's weight gain. Foremost, Dr. Cox's restrictions and Dr. McNulty's were both offered near the time of the hearing in 2019. Though Dr. Cox *first* offered an opinion about Sharp's work restrictions in 2016, he testified in 2019 that he reviewed his 2016 IME (along with Dr. McNulty's 2019 IME and Cox's medical records) and testified that his opinion *remained the same*. Since Dr. Cox's and Dr. McNulty's opinions were both rendered in 2019, the Commission could not logically conclude from the evidence that the passage of time solely accounted for the difference between them.

The Commission also ignored Dr. Cox's explanation that the primary difference between his IME and Dr. McNulty's was methodology. According to Dr. Cox, the reason for the difference between his opinion and Dr. McNulty's was that Dr. McNulty's opinion considered Sharp's reports of pain, whereas his own opinion did not take Sharp's pain into account. As Dr. Cox explained, he did not feel that a claimant's pain tolerance is a valid basis for work restrictions. Thus, Dr. Cox's opinion excluded Sharp's reported pain and focused on physical inability and risk for re-herniation at the L5-S1 level of Sharp's spine.

We do not express an opinion about the credibility of Dr. Cox's opinion, nor the validity of his method for assigning work restrictions without considering a claimant's pain. However, Sharp's pain must be accounted for somewhere in the Commission's disability analysis. "Pain may be considered as a medical factor, a non-medical factor, or both, but it must be considered." *Funes v. Aardema Dairy*, 150 Idaho 7, 11, 244 P.3d 151, 155 (2010) (citing *Graybill v. Swift & Co.*, 115 Idaho 293, 294–95, 766 P.2d 763, 764–65 (1988)). Defendants have disputed the extent of Sharp's pain, but not that he has continuously experienced pain since his accident. Because Dr. Cox's work restrictions effectively disregarded Sharp's pain (which was significant even before his weight

19

gain), his opinion cannot be relied upon as evidence of Sharp's disability unless the Commission otherwise accounts for Sharp's pain. There is no indication the Commission did so below. Therefore, in the event the Commission determines on remand that Sharp's conduct relieved Defendants of liability for post-MMI aggravation of his injury, it must re-evaluate the portion of Sharp's disability for which Defendants are liable.

## IV.    CONCLUSION

The Commission's decision is vacated, and the case is remanded for further proceedings consistent with this opinion.

Chief Justice BEVAN and Justices STEGNER, MOELLER, and ZAHN CONCUR.